The People
v.
Stone.

## The People vs. Stone.

The *obtaining of an endorsement* to a promissory note by *false pretences* and with a *fraudulent intent,* and which the party obtaining it *has actually used* for his own benefit, is within the spirit of the act rendering punishable the obtaining by false pretence *money, goods or chattels* or *other effects;* the words *other effects* in our statute are equivalent to the words *or other valuable thing* in the British act.

Whether a *note* or *endorsement* of which *no use* has been made, can be considered either *money, goods, chattels, other effects,* or *valuable thing—quere.*

By the revised statutes, the obtaining by false pretence *the signature of a person* to a written instrument, is classed with the *obtaining of money* by false pretence.

It is not necessary to *negative* ALL the pretences set forth in an indictment for obtaining property in violation of this statute; but those relied on by the pleader, and which he expects to prove were false, must be *specifically* and *directly* negatived; it is, however, sufficient to prove one of several assignments in a count.

A *fraud,* to be indictable at *common law,* must be such as *affects the public* or is calculated to defraud members, and which ordinary care and caution cannot guard against : as the use of *false weights and measures,* defrauding another under *false tokens* or by a *conspiracy to cheat.*

Where the fraud at common law is charged to have been effected by means of a *false token,* the token must be such as indicates a *general intent to defraud;* a mere privy token, or counterfeit letters in other men's names, seem not to come within the meaning of the term *false token* as used at common law.

A court of oyer and terminer, after *quashing* an indictment, may, at a *subsequent term,* give leave to the public prosecutor to make up a record as if judgment had been rendered for the defendant on demurrer, for the purpose of enabling him to sue out a writ of error; and should such leave be refused, this court will award a *mandamus.*

ERROR from the Rensselaer oyer and terminer. The defendant was indicted for *obtaining the endorsement* of one Augustus Filley to certain promissory notes by *false pretences.* The indictment on the motion of the defendant was *quashed,* and at a subsequent session of the court, the district attorney of the county of Rensselaer, for the purpose of enabling him to remove the case into this court by writ of error, was permitted by the oyer and terminer to make up a record, stating judgment to have been rendered for the defendant as on *de-*

*murrer* to the indictment. The indictment contained three counts: in the first of which it was stated, that on the 11th May, 1837, Filley was the endorser of Stone on eight promissory notes discounted at the Farmers' Bank, Troy, amounting together to the sum of $5428,51, and that at the same time Stone was indebted to Filley in the sum of $3000, besides the above responsibilities assumed by Filley as endorser; that Stone, contriving and intending to cheat and defraud Filley of his *monies* and *effects*, falsely pretended to Filley that he, Stone, had contracted to sell a paper-mill belonging to him to one C. Pickering, of Boston, for the sum of $16,000, and was to deliver possession of the same to Pickering on the first day of June then next, at which time Pickering was to pay him $11,000 in cash, and secure the residue by bond and mortgage on the paper-mill; that he, Stone, had entered into a *written contract* with Pickering relative to the said sale, and *showed the same* to Filley, which purported to be a contract containing the above stipulations, and contained a clause by which the party failing to perform bound himself to forfeit the sum of $500 as liquidated damages; that Stone pretended to have received two *letters* from Pickering, and *showed the same* to Filley, one of which purported to be a letter desiring Stone to increase the forfeiture in the contract to $1000, and the other purported to be a letter from Pickering, stating that he had enclosed in the same, $500 in bank bills, by way of earnest money to bind the bargain for the sale of the paper-mill; that Stone, to induce Filley to endorse a note for him for the sum of $5000, pretended that he wanted such endorsement to enable him to take up the eight notes before endorsed by Filley, and also pretended that he had paid and taken up three promissory notes of $1000 each, lent by Filley to Stone, and which had been negotiated to J. P. Cushman, Esq. and which Filley had become liable to pay, and also pretended that if Filley would endorse the said note for $5000, the same would be met and paid, and also all other demands which Filley had against Stone should be paid out of the first payment to be made by Pickering, on the first day of June then next. *By means of which false pretences,* Stone then and there, on, &c. at, &c. induced Filley to endorse a note for $5000,

made by Stone, payable to Filley thirty days after date, at the Farmers' Bank, and obtained the endorsement of Filley upon the note, which note was afterwards, to wit, on, &c. at, &c. *duly protested for non-payment*, and Filley, as the endorser thereof, made liable, and became and was liable and fixed as endorser, and obliged to pay and did pay the same. The count then *negatives* the several pretences, and concludes in the usual form, *contra formam statuti*.

The *second count* charges that Stone, intending to cheat and defraud Filley of his *money, goods, chattels, property* and *effects*, and to induce him to endorse *three certain promissory notes* herein after mentioned, on the 15th March, 1827, falsely pretended to Filley that he had sold $3000 worth of paper to one *Walls* in the state of New-Jersey, whom he represented as the brother of his foreman in his paper mill; that he had taken notes and landed security for the payment of the $3000; that he had written to New-Jersey and ascertained that the title to the property and the security was good; that he had double security for one half of the sum, for that he was indebted to his foreman in the sum of $1500, and that the foreman had agreed that no part of that sum should be paid to him until the three notes should be paid by the maker of the notes, the brother of the foreman. That Stone *then presented the notes* and requested Filley to endorse them, so that he might get them discounted at the Farmers' Bank in Troy, which notes were set forth, all of them bearing date 15th March, 1827, and all payable to Stone, the first being for the sum of $756,25, due five months after date, the second for $654,75, due six months after date, and the third being for $756,25, due seven months after date. *By means of which false pretences*, Stone did then and there induce Filley to endorse the said three notes as second endorser, Stone having first endorsed them, and Filley accordingly endorsed the notes, who thereby became liable for the payment of the same; which notes were afterwards duly protested for non-payment, and Filley became and was thereby liable and fixed as endorser, and has been obliged to assume and pay, and has assumed and paid the same when the said notes became due. The count then *negatives* the pretence of the sale of paper to

Walls in New-Jersey, and that Walls was a brother of the foreman of Stone; and avers that the notes were not made by the brother of the foreman, but by the foreman himself, at the request of Stone, without valuable consideration, and obtained by Stone for the purpose of defrauding Filley, concluding in the usual manner.

The *third count* charges that Stone, intending to cheat and defraud Filley of his *monies, goods, chattels* and *effects*, afterwards, on the 11th June, 1827, pretended that on the 31st May preceding, the said *C. Pickering* had been at Troy, and had taken the title papers of the paper mill to Albany to consult counsel in relation to the same, and that he, Stone, had agreed to meet Pickering there; that he went to Albany, where he found a line from Pickering, stating that he had been obliged to go down the river, but urging Stone to be at home the fore part of the next week, to close the concern in relation to the paper mill. This count further charged, that on, &c. at, &c. Stone did *further* pretend that one A. Greele, of New-York, was indebted to him in the sum of $7000 for paper and rags sold and delivered to him; that Greele was willing to advance from $2000 to $4000 in cash, on account of his indebtedness, if he, Stone, would procure three promissory notes of $2000 each, to be made by Filley and to be endorsed by J. P. Cushman, payable in 2, 4 and 6 months at the Manhattan Bank in New-York; that he, Greele, would procure such notes to be discounted, and let Stone have the money on the same, and would receive the amount of the notes in paper from Stone, and pay up the notes as they became due; that Stone pretended that he should be able to turn out of his paper mill, paper to the amount of $9000 within 90 days, and that by giving the said three notes, the $5000 in the first count mentioned would be met and paid. *By means of which false pretences,* Stone induced Filley to sign three notes of $2000 each, severally bearing date on the 11th June, 1827, payable to J. P. Cushman, or order, at the Manhattan Bank, New-York, in 2, 4 and 6 months, and obtained the same from Filley, which notes were on the same day endorsed by the payee, and delivered to Stone. The count then *negatives* the pretences that Pickering was at Troy on the

31st May, that a meeting between him and Stone was agreed to take place in Albany, or that any communication was had between them relative to the sale of the paper mill ; it also negatives the pretences that Greele was indebted to Stone in the sum of $7000, or any other sum, and avers that Stone knew that Greele would not advance to him $2000 or $4000, or any other sum on account of any indebtedness on his part to Stone, and that he would not procure the said three notes to be discounted for the purpose of advancing the same to Stone to meet and pay the $5000 note ; also that Stone well knew that he could not and would not turn out from his paper mill, paper to the value of $9000, within 90 days, for the purpose of meeting the payment thereof, and that he would not turn out or sell, or forward to Greele any paper for the purpose of paying the said notes ; and also that he well knew that on the said 11th June, 1827, he was indebted to Greele in a large sum of money, to wit, in the sum of $5000 ; and also that he did not procure and obtain the said three notes for the purpose of raising money thereon to meet and pay the $5000 note, but on the contrary intended to cheat and defraud Filley, and oblige him as the maker of the same to pay the notes when they should become due out of his own monies, to the evil example, &c.

Attached to the *transcript* of the record of judgment was a stipulation signed by the district attorney and by the counsel for the defendant, from which it appeared that the indictment was *quashed* by the oyer and terminer, in June, 1829 ; that this court was applied to for a *mandamus*, directing the oyer and terminer to vacate the rule entered by them quashing the indictment, which application was denied by this court, accompanied by advice to the district attorney to apply to the oyer and terminer for leave to make up a record as of a judgment for the defendant on demurrer to the indictment ; that in November, 1829, the oyer and terminer vacated the rule quashing the indictment, and gave leave to the district attorney to make up a record as suggested by this court, which was accordingly done, and the record brought into this court by writ of error; and that in November, 1830, the said oyer and terminer *directed* the district attorney to file *another record,*

setting forth the *order to quash* the indictment and the sub- NEW-YORK, sequent proceedings had in the case.

*J. Pierson,* (district attorney of Rensselaer,) for the people.

*T. Clowes & J. P. Cushman,* for the defendant. The principal grounds relied on by the counsel for the defendant, in opposition to a reversal of the judgment of the oyer and terminer, were, 1. That the judgment of the oyer and terminer in June, 1829, *quashing* the indictment could not be altered by that court at a *subsequent term,* when it was insisted that the oyer and terminer had not jurisdiction of the case; and 2. That the frauds set forth in the indictment are not punishable at *common law,* nor are they made so by *statute.* The statute subjects to punishment any person who " shall knowingly and designedly by false pretences obtain from any other person any *money, goods or chattels, or other effects whatsoever,* with intent to cheat or defraud any person," &c. 1 *R. L.* 410, § 13. Obtaining the *endorsement of a note* is not obtaining *money,* nor can it be considered as obtaining *goods or chattels* within the meaning of the statute. The word *effects* has a more enlarged signification, but even that must be considered as applying to things *ejusdem generis,* with which it is associated. 13 *Ves.* 39. It surely does not include choses in action. The provision in the *revised statutes* classing the obtaining by false pretence *the signature of any person to any written instrument* with the offence of obtaining money, &c. by false pretence, is evidence that until then such an act was not considered as an offence within the statute. 2 *R. S.* 677, § 53. Other considerations were urged by the counsel, which are not here stated, as they are fully passed upon in the opinion delivered.

*By the Court,* SUTHERLAND, J. The cheat, or fraud, charged in this indictment, is not an offence punishable at common law. A fraud, to be indictable at common law, must be such as affects *the public,* or is calculated to defraud numbers, and which ordinary care and caution cannot guard against: as if a man uses *false weights and measures,* and sells by them to

his customers, in the general course of his dealing; or de-frauds another under *false tokens;* or if there be a *conspira-cy to cheat;* for common care and prudence are no protec-tion against these. This was the rule laid down by Lord Mansfield, in *Rex* v. *Wheatley*, 2 *Burr.* 1127, and has ever since been considered as establishing the true boundary be-tween frauds that are and those that are not indictable at common law. *Rex* v. *Young*, 3 *T. R.* 104. 6 *Mod. R.* 42. 1 *Salk.* 379. 6 *T. R.* 565. 1 *East*, 185. 2 *Strange*, 866. 2 *East's Crown Law*, 816. It was adopted and followed by this court in *The People* v. *Babcock*, 7 *Johns. R.* 201, and *The People* v. *Johnson*, 12 *Johns. R.* 292.]

The better opinion seems to be, that in order to render a cheat or fraud indictable at common law, on the ground that it was effected by means of a *false token*, the token must be such as indicates a *general intent to defraud*, and therefore is an injury to the public. A mere privy token, or counterfeit letters in other men's names, seem not to come within the meaning of the term false token, as used at common law. Mr. Chitty, 3 *Chitty's C. L.* 995, says, the cases in which fraud is indictable at common law, seem confined to the use of false weights and measures, the selling goods with counterfeit marks, playing with false dice, and frauds affecting the course of justice, and immediately injuring the interests of the pub-lic. Forgery and conspiracy he considers distinct offences.

Mr. East, *East's C. L.* 817, 820, says, that the general propo-sition that frauds effected by means of *fales tokens* are indicta-ble at common law, applies only to such false tokens as affect the public at large ; such as are calculated to defraud num-bers, to deceive the people in general, as false weights and measures. *Cowp.* 323. This view of the common law offence of cheating derives strong confirmation from the provisions of the statute of 38 Hen. 8, ch. 1. By that statute the obtain-ing goods by *privy tokens*, or *counterfeit letters in other men's names*, &c. is expressly made an indictable offence. As to *privy tokens*, at least, this statute has always been consider-ed as creating a new offence, though *counterfeit letters* of a certain description were perhaps indictable as forgeries at common law. 2 *Lord Raym.* 1466. 3 *Chitty's C. L.* 997.

But the offence charged is unquestionably indictable, under the statute against obtaining goods, &c. by *false pretences*, if it is alleged in proper form. Our statute, 1 *R. L.* 410, § 13, contains substantially the provisions of the English statutes of 33d Henry 8, 30th George 2, and the 52d of George 3. Mr. Chitty, *Chitty's C. L.* 998, sums up what he considers the common and statute law upon this subject as follows: At common law he says, those cheats only were indictable which affected the public at large. The 33d Henry 8 made all such frauds on individuals criminal as were effected by *privy tokens*, and by which *either money or goods* were obtained. The 30th George 2, ch. 24, extended the means of deceit thus made indictable to every kind of *false pretences*, by which *money, goods and chattels* were obtained. And the 52d George 3, finally made every description of fraud by *false pretences* criminal, *whatever kind of valuable property* the deception was intended to obtain. Our statute provides that every person who shall knowingly and designedly by false pretence, obtain from any other person any money, goods or chattels, or *other effects whatsoever*, with intent to cheat or defraud any person, &c. shall be punished, &c. Our statute is at least as comprehensive as all the English acts combined.

It is objected to this indictment, considered as an indictment under the statute: 1. That all the counts are bad for uncertainty, in not alleging that the notes which Filley was induced to endorse for the defendant, by the false pretences set forth in the indictment, were ever negotiated, or that the defendant ever received any money from them, or when and where it was received; 2. That the circumstances stated in the indictment do not sufficiently show the fraudulent intent of the defendant, admitting the representations made by him and by which the endorsements of Filley were procured to have been false, and that a mere general allegation that the act was done with the intent to defraud, is not sufficient; 3. That endorsements of promissory notes are not goods and chattels, or other effects, within the meaning of the statute; 4. And principally, that the pretences are not all negatived in either count of the indictment.

The first and second counts of the indictment expressly aver that Filley was charged as endorser upon the notes mentioned therein, and which it is alleged he was induced to endorse by the false pretences of the defendant, and that he had been obliged to pay, and had actually paid the same. Filley could not have been charged as endorser, unless the notes had been negotiated, and their payment by him, whoever was the holder at the time, must have been for the use and benefit of the defendant, for whose accommodation they were endorsed. The third count does not show that Filley ever paid the notes mentioned therein, or that Stone ever parted with them or put them in circulation, or that Filley ever suffered inconvenience or loss in consequence of having signed them. For aught that appears, they may have been immediately destroyed by Stone or returned to Filley, or may now be in the hands of Stone, where they are incapable of being used to the prejudice of any of the parties to them. Our revised statutes, like the 52 *Geo. 3d*, 2 *R. S.* 677, make it an offence in express terms to obtain *the signature of any person to any written instrument* by any false pretence, with intent to cheat or defraud another. Under this statute, the offence is complete when the signature is obtained, if it were obtained by false pretences and with a fraudulent intent, although it may never be used to the prejudice of any person. But whether a note, where no use has been made of it, can be considered either money, or goods or chattels, or a valuable thing, may be questionable. It is not however important in this case, as the objection has been shown not to exist in relation to the other two counts ; and if any one count is good, it is sufficient. That a note obtained by false pretences and with a fraudulent intent, and which the party has actually used for his own benefit, is embraced within the spirit of the act as it stood before the revised statutes, I have no doubt. The words *other effects*, as used in this act, it is obvious, when the connection in which they stand is taken into consideration, were designed to be most comprehensive. They were probably intended to embrace every thing of a personal character, not appropriately and strictly falling under the description of money, or goods or chattels.

I consider them as equivalent to the words *or other valuable thing whatsoever* in the British act.

The circumstances stated in the indictment sufficiently show the fraudulent intent of the defendant.

It is not necessary to negative all the pretences set forth in the indictment. Those relied upon by the pleader, and which he expects to prove were false, must be specifically and directly negatived. It is not sufficient to charge that the defendant *falsely pretended,* &c. setting forth the means used, and then to aver that by the means *of such false pretences* he obtained the property ; but the pleader must go on as in an assignment of perjury, and falsify by specific and distinct averments such of the pretences as he intends to prove upon the trial were used and were false. 3 *Chitty's Cr. L.* 762, 999. 2 *id.* 163, 311. 2 *Maule & Selw.* 379. The object of this specification is to give notice to the defendant of what he is to come prepared to answer ; and although there be several assignments in one count, it will be sufficient to prove one of them. 2 *Ld. Raym.* 886. 2 *Campb.* 138. *Croke Ch.* 622. If it were necessary to negative all the pretences in the indictment, it would be necessary to prove them all false upon the trial. This it clearly is not. The objection to the indictment on this ground is therefore unfounded.

The only remaining question is whether the court of oyer and terminer had authority to permit a record to be made up in this case as of a judgment upon demurrer. In June term, 1829, the court below quashed the indictment. In November term following, upon the application of the district attorney, and in pursuance of the advice of this court, they vacated the rule quashing the indictment, and permitted the district attorney to make up and file a record, in the same manner and form as if the defendant had demurred to the indictment and judgment had been rendered in his favor thereon. This course was pursued for the purpose of enabling the district attorney to bring a writ of error, as no writ of error can be brought upon an order quashing an indictment. It is like an arrest of judgment for the insufficiency of the declaration; there is no judgment to be affirmed or reversed. In the latter case it is perfectly well settled that the plaintiff has a right

NEW-YORK,
May, 1832.

The People
v.
Stone.

to move the court below for judgment in favor of the defendant against himself, for the purpose of being enabled to bring a writ of error; and if the court below refuses to give such judgment, this court will grant a mandamus to compel them to do it. The practice of this court in this respect is well established. There are several reported cases upon this subject, and many more which have not been reported; *Fish* v. *Weatherwax,* 2 *Johns. Cas.* 215; *Horne* v. *Barry,* 19 *Johns. R.* 247; and in the recent case of *The People* v. *The Onondaga C. P.* 2 *Wendell,* 631, this was held to be the proper course to be pursued in a criminal case, where the court below had arrested the judgment. It certainly is equally proper where the indictment has been quashed. The power and jurisdiction of the court over the cause are not determined either by an order arresting the judgment or quashing the indictment. It is competent for a court, upon proper cause shown, and upon proper terms, with a view of promoting the substantial purposes of justice, to vacate or set aside its most formal rules and orders. It is unusual for a court to quash an indictment, unless it is most clearly and obviously bad. They will drive the defendant to his demurrer, or to a motion in arrest of judgment, or a writ of error. 1 *Chitty's Cr. L.* 246, 300. Where an indictment therefore has been quashed, and the public prosecutor wishes to have the opinion of the court reviewed, it is their duty to vacate the rule, if the application is made within a reasonable time, and give to their judgment a form which will enable the district attorney to bring a writ of error.

On the whole, therefore, I am of opinion that the two first counts of the indictment are good, and that the judgment of the court below ought therefore to be reversed.

Judgment reversed.