## UNITED STATES *v.* REESE ET AL.

1. Rights and immunities created by or dependent upon the Constitution of the United States can be protected by Congress. The form and manner of that protection may be such as Congress, in the legitimate exercise of its legislative discretion, shall provide, and may be varied to meet the necessities of a particular right.
2. The Fifteenth Amendment to the Constitution does not confer the right of suffrage; but it invests citizens of the United States with the right of

exemption from discrimination in the exercise of the elective franchise on account of their race, color, or previous condition of servitude, and empowers Congress to enforce that right by " appropriate legislation."

3. The power of Congress to legislate at all upon the subject of voting at State elections rests upon this amendment, and can be exercised by providing a punishment only when the wrongful refusal to receive the vote of a qualified elector at such elections is because of his race, color, or previous condition of servitude.

4. The third and fourth sections of the act of May 31, 1870 (16 Stat. 140), not being confined in their operation to unlawful discrimination on account of race, color, or previous condition of servitude, are beyond the limit of the Fifteenth Amendment, and unauthorized.

5. As these sections are in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, and cannot be limited by judicial construction so as to make them operate only on that which Congress may rightfully prohibit and punish, — *Held*, that Congress has not provided by " appropriate legislation " for the punishment of an inspector of a municipal election for refusing to receive and count at such election the vote of a citizen of the United States of African descent.

6. Since the passage of the act which gives the presiding judge the casting vote in cases of division, and authorizes a judgment in accordance with his opinion (Rev. Stat., sect. 650), this court, if it finds that the judgment as rendered is correct, need do no more than affirm it. If, however, that judgment is reversed, all questions certified, which are considered in the final determination of the case here, should be answered.

ERROR to the Circuit Court of the United States for the District of Kentucky.

This case was argued at the October Term, 1874, by *Mr. Attorney-General Williams* and *Mr. Solicitor-General Phillips* for the United States, and by *Mr. Henry Stanbery* and *Mr. B. F. Buckner* for the defendants.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This case comes here by reason of a division of opinion between the judges of the Circuit Court in the District of Kentucky. It presents an indictment containing four counts, under sects. 3 and 4 of the act of May 31, 1870 (16 Stat. 140), against two of the inspectors of a municipal election in the State of Kentucky, for refusing to receive and count at such election the vote of William Garner, a citizen of the United States of African descent. All the questions presented by the certificate of division arose upon general demurrers to the several counts of the indictment.

In this court the United States abandon the first and third counts, and expressly waive the consideration of all claims not arising out of the enforcement of the Fifteenth Amendment of the Constitution.

After this concession, the principal question left for consideration is, whether the act under which the indictment is found can be made effective for the punishment of inspectors of elections who refuse to receive and count the votes of citizens of the United States, having all the qualifications of voters, because of their race, color, or previous condition of servitude.

If Congress has not declared an act done within a State to be a crime against the United States, the courts have no power to treat it as such. *U. S.* v. *Hudson*, 7 Cranch, 32. It is not claimed that there is any statute which can reach this case, unless it be the one in question.

Looking, then, to this statute, we find that its first section provides that all citizens of the United States, who are or shall be otherwise qualified by law to vote at any election, &c., shall be entitled and allowed to vote thereat, without distinction of race, color, or previous condition of servitude, any constitution, &c., of the State to the contrary notwithstanding. This simply declares a right, without providing a punishment for its violation.

The second section provides for the punishment of any officer charged with the duty of furnishing to citizens an opportunity to perform any act, which, by the constitution or laws of any State, is made a prerequisite or qualification of voting, who shall omit to give all citizens of the United States the same and equal opportunity to perform such prerequisite, and become qualified on account of the race, color, or previous condition of servitude, of the applicant. This does not apply to or include the inspectors of an election, whose only duty it is to receive and count the votes of citizens, designated by law as voters, who have already become qualified to vote at the election.

The third section is to the effect, that, whenever by or under the constitution or laws of any State, &c., any act is or shall be required to be done by any citizen as a prerequisite to qualify or entitle him to vote, the offer of such citizen to perform the act required to be done " as aforesaid " shall, if it

fail to be carried into execution by reason of the wrongful act or omission "aforesaid" of the person or officer charged with the duty of receiving or permitting such performance, or offer to perform, or acting thereon, be deemed and held as a performance in law of such act; and the person so offering and failing as aforesaid, and being otherwise qualified, shall be entitled to vote in the same manner, and to the same extent, as if he had, in fact, performed such act; and any judge, inspector, or other officer of election, whose duty it is to receive, count, &c., or give effect to, the vote of any such citizen, who shall wrongfully refuse or omit to receive, count, &c., the vote of such citizen, upon the presentation by him of his affidavit stating such offer, and the time and place thereof, and the name of the person or officer whose duty it was to act thereon, and that he was wrongfully prevented by such person or officer from performing such act, shall, for every such offence, forfeit and pay, &c.

The fourth section provides for the punishment of any person who shall, by force, bribery, threats, intimidation, or other unlawful means, hinder, delay, &c., or shall combine with others to hinder, delay, prevent, or obstruct, any citizen from doing any act required to be done to qualify him to vote, or from voting, at any election.

The second count in the indictment is based upon the fourth section of this act, and the fourth upon the third section.

Rights and immunities created by or dependent upon the Constitution of the United States can be protected by Congress. The form and the manner of the protection may be such as Congress, in the legitimate exercise of its legislative discretion, shall provide. These may be varied to meet the necessities of the particular right to be protected.

The Fifteenth Amendment does not confer the right of suffrage upon any one. It prevents the States, or the United States, however, from giving preference, in this particular, to one citizen of the United States over another on account of race, color, or previous condition of servitude. Before its adoption, this could be done. It was as much within the power of a State to exclude citizens of the United States from voting on account of race, &c., as it was on account of age, property,

or education. Now it is not. If citizens of one race having certain qualifications are permitted by law to vote, those of another having the same qualifications must be. Previous to this amendment, there was no constitutional guaranty against this discrimination : now there is. It follows that the amendment has invested the citizens of the United States with a new constitutional right which is within the protecting power of Congress. That right is exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude. This, under the express provisions of the second section of the amendment, Congress may enforce by " appropriate legislation."

This leads us to inquire whether the act now under consideration is " appropriate legislation " for that purpose. The power of Congress to legislate at all upon the subject of voting at State elections rests upon this amendment. The effect of art. 1, sect. 4, of the Constitution, in respect to elections for senators and representatives, is not now under consideration. It has not been contended, nor can it be, that the amendment confers authority to impose penalties for every wrongful refusal to receive the vote of a qualified elector at State elections. It is only when the wrongful refusal at such an election is because of race, color, or previous condition of servitude, that Congress can interfere, and provide for its punishment. If, therefore, the third and fourth sections of the act are beyond that limit, they are unauthorized.

The third section does not in express terms limit the offence of an inspector of elections, for which the punishment is provided, to a wrongful discrimination on account of race, &c. This is conceded ; but it is urged, that when this section is construed with those which precede it, and to which, as is claimed, it refers, it is so limited. The argument is, that the only wrongful act, on the part of the officer whose duty it is to receive or permit the requisite qualification, which can dispense with actual qualification under the State laws, and substitute the prescribed affidavit therefor, is that mentioned and prohibited in sect. 2, — to wit, discrimination on account of race, &c. ; and that, consequently, sect. 3 is confined in its operation to the same wrongful discrimination.

This is a penal statute, and must be construed strictly; not so strictly, indeed, as to defeat the clear intention of Congress, but the words employed must be understood in the sense they were obviously used.  *United States* v. *Wiltberger*, 5 Wheat. 85.  If, taking the whole statute together, it is apparent that it was not the intention of Congress thus to limit the operation of the act, we cannot give it that effect.

The statute contemplates a most important change in the election laws.  Previous to its adoption, the States, as a general rule, regulated in their own way all the details of all elections.  They prescribed the qualifications of voters, and the manner in which those offering to vote at an election should make known their qualifications to the officers in charge.  This act interferes with this practice, and prescribes rules not provided by the laws of the States.  It substitutes, under certain circumstances, performance wrongfully prevented for performance itself.  If the elector makes and presents his affidavit in the form and to the effect prescribed, the inspectors are to treat this as the equivalent of the specified requirement of the State law.  This is a radical change in the practice, and the statute which creates it should be explicit in its terms.  Nothing should be left to construction, if it can be avoided.  The law ought not to be in such a condition that the elector may act upon one idea of its meaning, and the inspector upon another.

The elector, under the provisions of the statute, is only required to state in his affidavit that he has been wrongfully prevented by the officer from qualifying.  There are no words of limitation in this part of the section.  In a case like this, if an affidavit is in the language of the statute, it ought to be sufficient both for the voter and the inspector.  Laws which prohibit the doing of things, and provide a punishment for their violation, should have no double meaning.  A citizen should not unnecessarily be placed where, by an honest error in the construction of a penal statute, he may be subjected to a prosecution for a false oath; and an inspector of elections should not be put in jeopardy because he, with equal honesty, entertains an opposite opinion.  If this statute limits the wrongful act which will justify the affidavit to discrimination on account of race, &c., then a citizen who makes an affidavit that he has been

wrongfully prevented by the officer, which is true in the ordinary sense of that term, subjects himself to indictment and trial, if not to conviction, because it is not true that he has been prevented by such a wrongful act as the statute contemplated; and if there is no such limitation, but any wrongful act of exclusion will justify the affidavit, and give the right to vote without the actual performance of the prerequisite, then the inspector who rejects the vote because he reads the law in its limited sense, and thinks it is confined to a wrongful discrimination on account of race, &c., subjects himself to prosecution, if not to punishment, because he has misconstrued the law. Penal statutes ought not to be expressed in language so uncertain. If the legislature undertakes to define by statute a new offence, and provide for its punishment, it should express its will in language that need not deceive the common mind. Every man should be able to know with certainty when he is committing a crime.

But when we go beyond the third section, and read the fourth, we find there no words of limitation, or reference even, that can be construed as manifesting any intention to confine its provisions to the terms of the Fifteenth Amendment. That section has for its object the punishment of all persons, who, by force, bribery, &c., hinder, delay, &c., any person from qualifying or voting. In view of all these facts, we feel compelled to say, that, in our opinion, the language of the third and fourth sections does not confine their operation to unlawful discriminations on account of race, &c. If Congress had the power to provide generally for the punishment of those who unlawfully interfere to prevent the exercise of the elective franchise without regard to such discrimination, the language of these sections would be broad enough for that purpose.

It remains now to consider whether a statute, so general as this in its provisions, can be made available for the punishment of those who may be guilty of unlawful discrimination against citizens of the United States, while exercising the elective franchise, on account of their race, &c.

There is no attempt in the sections now under consideration to provide specifically for such an offence. If the case is provided for at all, it is because it comes under the general pro-

hibition against any wrongful act or unlawful obstruction in this particular. We are, therefore, directly called upon to decide whether a penal statute enacted by Congress, with its limited powers, which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which Congress may rightfully prohibit and punish. For this purpose, we must take these sections of the statute as they are. We are not able to reject a part which is unconstitutional, and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there. Each of the sections must stand as a whole, or fall altogether. The language is plain. There is no room for construction, unless it be as to the effect of the Constitution. The question, then, to be determined, is, whether we can introduce words of limitation into a penal statute so as to make it specific, when, as expressed, it is general only.

It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government. The courts enforce the legislative will when ascertained, if within the constitutional grant of power. Within its legitimate sphere, Congress is supreme, and beyond the control of the courts; but if it steps outside of its constitutional limitations, and attempts that which is beyond its reach, the courts are authorized to, and when called upon in due course of legal proceedings must, annul its encroachments upon the reserved power of the States and the people.

To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty.

We must, therefore, decide that Congress has not as yet provided by "appropriate legislation" for the punishment of the offence charged in the indictment; and that the Circuit Court

properly sustained the demurrers, and gave judgment for the defendants.

This makes it unnecessary to answer any of the other questions certified. Since the law which gives the presiding judge the casting vote in cases of division, and authorizes a judgment in accordance with his opinion (Rev. Stat., sect. 650), if we find that the judgment as rendered is correct, we need not do more than affirm. If, however, we reverse, all questions certified, which may be considered in the final determination of the case according to the opinion we express, should be answered.

*Judgment affirmed.*

MR. JUSTICE CLIFFORD and MR. JUSTICE HUNT dissenting.

MR. JUSTICE CLIFFORD : —

I concur that the indictment is bad, but for reasons widely different from those assigned by the court.

States, as well as the United States, are prohibited by the Fifteenth Amendment of the Constitution from denying or abridging the right of citizens of the United States to vote on account of race, color, or previous condition of servitude; and power is vested in Congress, by the second article of that amendment, to enforce that prohibition " by appropriate legislation."

Since the adoption of that amendment, Congress has legislated upon the subject; and, by the first section of the Enforcement Act, it is provided that citizens of the United States, without distinction of race, color, or previous condition of servitude, shall, if *otherwise* qualified to vote in state, territorial, or municipal elections, be entitled and allowed to vote at all such elections, any constitution, law, custom, usage, or regulalation of any State or Territory, or by or under its authority, to the contrary notwithstanding.

Beyond doubt, that section forbids all discrimination between white citizens and citizens of color in respect to their right to vote ; but the section does not provide that the person or officer making such discrimination shall be guilty of any offence, nor does it prescribe that the person or officer guilty of making such discrimination shall be subject to any fine, penalty, or

punishment whatever.    None of the counts of the indictment in this case, however, are framed under that section; nor will it be necessary to give it any further consideration, except so far as it may aid in the construction of the other sections of the act.    16 Stat. 140.

Sect. 2 of the act will deserve more examination, as it assumes that certain acts are or may be required to be done by or under the authority of the constitution or laws of certain States, or the laws of certain Territories, as a prerequisite or qualification for voting, and that certain persons or officers are or may be, by such constitution or laws, charged with the performance of duties in furnishing to such citizens an opportunity to perform such prerequisites to become qualified to vote; and provides that it shall be the duty of every such person or officer to give all such citizens, without distinction of race, color, or previous condition of servitude, the same and equal opportunity to perform such prerequisites to become qualified to vote.

Equal opportunity is required by that section to be given to all such citizens, without distinction of race, color, or previous condition of servitude, to perform the described prerequisite; and the further provision of the same section is, that, if any such person or officer charged with the performance of the described duties shall refuse or knowingly omit to give full effect to the requirements of that section, he shall for every such offence forfeit and pay $500 to the person aggrieved, and also be deemed guilty of a misdemeanor, and punished as therein provided.    Other sections applicable to the subject are contained in the Enforcement Act, to which reference will hereafter be made.    16 id. 141.

1. Four counts are exhibited in the indictment against the defendants; and the record shows that the defendants filed a demurrer to each of the counts, which was joined in behalf of the United States.    Two of the counts — to wit, the first and the third — having been abandoned at the argument, the examination will be confined to the second and the fourth.    By the record, it also appears that the defendants, together with one William Farnaugh, on the 30th of January, 1873, were the lawful inspectors of a municipal election held on that day in the city of Lexington, in the State of Kentucky, pursuant to

the constitution and laws of that State, and that they, as such inspectors, were then and there charged by law with the duty of receiving, counting, certifying, registering, reporting, and giving effect to the vote of all citizens qualified to vote at said election in Ward 3 of the city ; and the accusation set forth in the second count of the indictment is, that one William Garner, at said municipal election, offered to the said inspectors at the polls of said election in said Ward 3 to vote for members of the said city council, the said poll being then and there the lawful and proper voting place and precinct of the said William Garner, who was then and there a free male citizen of the United States and of the State, of African descent, and having then and there resided in said State more than two years, and in said city more than one year, next preceding said election, and having been a resident of said voting precinct and ward in which he offered to vote more than sixty days immediately prior to said election, and being then and there, at the time of such offer to vote, qualified and entitled, as alleged, by the laws of the State, to vote at said election.

Offer in due form to vote at the said election having been made, as alleged, by the said William Garner, the charge is that the said William Farnaugh consented to receive, count, register, and give effect to the vote of the party offering the same ; but that the defendants, constituting the majority of the inspectors at the election, and, as such, having the power to receive or reject all votes offered at said poll, did then and there, when the said party offered to vote, unlawfully agree and confer with each other that they, as such inspectors, would not take, receive, certify, register, report, or give effect to the vote of any voters of African descent, offered at said election, unless the voter so offering to vote, besides being *otherwise* qualified to vote, had paid to said city the capitation-tax of one dollar and fifty cents for the preceding year, on or before the 15th of January prior to the day of the election ; which said agreement, the pleader alleges, was then and there made with intent thereby to hinder, prevent, and obstruct all voters of African descent on account of their race and color, though lawfully entitled to vote at said election, from so voting. Taken separately, that allegation would afford some support to the

theory of the United States; but it must be considered in connection with the allegation which immediately follows it in the same count, where it is alleged as follows: That the defendants, in pursuance of said unlawful agreement, did then and there, at the election aforesaid, wrongfully and illegally require and demand of said party, when he offered to vote as aforesaid, that he should, as a prerequisite and qualification to his voting at said election, produce evidence of his having paid to said city or its proper officers the said capitation-tax of one dollar and fifty cents for the year preceding, on or before the 15th of January preceding the day of said election; and the averment is to the effect that the party offering his vote then and there refused to comply with that illegal requirement and demand, or to produce the evidence so demanded and required.

Offences created by statute, as well as offences created at common law, with rare exceptions, consist of more than one ingredient, and, in some cases, of many; and the rule is universal, that every ingredient of which the offence is composed must be accurately and clearly alleged in the indictment, or the indictment will be bad on demurrer, or it may be quashed on motion, or the judgment may be arrested before sentence, or be reversed on a writ of error. *United States* v. *Cook,* 17 Wall. 174.

Matters well pleaded, it is true, are admitted by the demurrer; but it is equally true, that every ingredient of the offence must be accurately and clearly described, and that no indictment is sufficient if it does not accurately and clearly describe all the ingredients of which the offence is composed.

Citizens of the United States, without distinction of race, color, or previous condition of servitude, if *otherwise* qualified to vote at a state, territorial, or municipal election, shall be entitled and allowed to vote at such an election, even though the constitution, laws, customs, usages, or regulations of the State or Territory do not allow, or even prohibit, such voter from exercising that right. 16 Stat. 140, sect. 1.

Evidently the purpose of that section is to place the male citizen of color, as an elector, on the same footing with the white male citizen. Nothing else was intended by that pro-

vision, as is evident from the fact that it does not profess to enlarge or vary the prior existing right of white male citizens in any respect whatever. Conclusive support to that theory is also derived from the second section of the same act, which was obviously passed to enforce obedience to the rule forbidding discrimination between colored male citizens and white male citizens in respect to their right to vote at such elections.

By the charter of the city of Lexington, it is provided that a tax shall be levied on each free male inhabitant of twenty-one years of age and upwards, except paupers, inhabiting said city, at a ratio not exceeding one dollar and fifty cents each. Sess. Laws 1867, p. 441.

Such citizens, without distinction of race, color, or previous condition of servitude, in order that they may be entitled to vote at any such election, must be free male citizens " over twenty-one years of age, have been a resident of the city at least six months, and of the ward in which he resides at least sixty days, prior to the day of the election, and have paid the capitation-tax assessed by the city on or before the 15th of January preceding the day of election." 2 Sess. Laws 1870, p. 71.

White male citizens, not possessing the qualifications to vote required by law, find no guaranty of the right to exercise that privilege by the first section of the Enforcement Act; but the mandate of the section is explicit and imperative, that all citizens, without distinction of race, color, or previous condition of servitude, if *otherwise* qualified to vote at any state, territorial, or municipal election, shall be entitled and allowed to vote at all such elections, even though forbidden so to do, on account of race, color, or previous condition of servitude, by the constitution of the State, or by the laws, custom, usage, or regulation of the State or Territory, where the election is held.

Disability to vote of every kind, arising from race, color, or previous condition of servitude, is declared by the first section of that act to be removed from the colored male citizen; but, unless *otherwise* qualified by law to vote at such an election, he is no more entitled to enjoy that privilege than a white male citizen who does not possess the qualifications required by law to constitute him a legal voter at such an election.

Legal disability to vote at any such election, arising from race, color, or previous condition of servitude, is removed by the Fifteenth Amendment, as affirmed in the first section of the Enforcement Act: but the Congress knew full well that cases would arise where the want of other qualifications, if not removed, might prevent the colored citizen from exercising the right of suffrage at such an election ; and the intent and purpose of the second section of the act are to furnish to all citizens an opportunity to remove every such other disability to enable them to become qualified to exercise that right, and to punish persons and officers charged with any duty in that regard who unlawfully and wrongfully refuse or wilfully omit to co-operate to that end.   Hence it is provided, that where any act is or shall be required to be done as a prerequisite or qualification for voting, and persons or officers are charged in the manner stated with the performance of duties in furnishing to citizens an opportunity to perform such prerequisite or to become qualified to vote, it shall be the duty of every such person and officer to give all citizens, without distinction of race, color, or previous condition of servitude, the same and equal opportunity to perform such prerequisite, and to become qualified to vote.

Persons or officers who wrongfully refuse or knowingly omit to perform the duty with which they are charged by that clause of the second section of the Enforcement Act commit the offence defined by that section, and incur the penalty, and subject themselves to the punishment, prescribed for that offence.

Enough appears in the second count of the indictment to show beyond all question that it cannot be sustained under the second section of the Enforcement Act, as the count expressly alleges that the defendants as such inspectors, at the time the complaining party offered his vote, refused to receive and count the same because he did not produce evidence that he had paid to the city the capitation-tax of one dollar and fifty cents assessed against him for the preceding year, which payment, it appears by the law of the State, is a prerequisite and necessary qualification to enable any citizen to vote at that election, without distinction of race, color, or previous condition of servitude ; and the express allegation of the count is, that the party offering his vote then and there refused to comply with that prerequisite,

and then and there demanded that his vote should be received and counted without his complying with that prerequisite.

Argument to show that such allegations are insufficient to constitute the offence defined in the second section of the Enforcement Act, or any other section of that act, is quite unnecessary, as it appears in the very terms of the allegations that the party offering his vote was not, irrespective of his race, color, or previous condition of servitude, a qualified voter at such an election by the law of the State where the election was held.

Persons within the category described in the first section of the Enforcement Act, of whom it is enacted that they shall be entitled and allowed to vote at such an election, without distinction of race, color, or previous condition of servitude, are citizens of the United States *otherwise qualified to vote* at the election pending; and inasmuch as it is not alleged in the count that the party offering his vote in this case was *otherwise* qualified by law to vote at the time he offered his vote, and inasmuch as no excuse is pleaded for not producing evidence to establish that prerequisite of qualification, it is clear that the supposed offence is not set forth with sufficient certainty to justify a conviction and sentence of the accused.

2. Defects also exist in the fourth count; but it becomes necessary, before considering the questions which those defects present, to examine with care the third section of the Enforcement Act.    Sect. 3 of that act differs in some respects from the second section; as, for example, sect. 3 provides that whenever under the constitution and laws of a State, or the laws of a Territory, any act is or shall be required to be done by any such citizen as a prerequisite to qualify or entitle him to vote, the offer of any such citizen to perform the act required to be done as aforesaid shall, *if it fail to be carried into execution* by reason of the wrongful act or omission aforesaid of the person or officer charged with the duty of receiving or permitting such performance or offer to perform, be deemed and held as a performance in law of such act; and the person so offering and failing as aforesaid, and *being otherwise qualified*, shall be entitled to vote in the same manner and to the same extent as if he had, in fact, performed the said act.    By that clause of the section, it is enacted that the offer of the party interested to

perform the prerequisite act to qualify or entitle him to vote shall, if it fail for the reason specified, have the same effect as the actual performance of the prerequisite act would have; and the further provision is, that any judge, inspector, or other officer of election, whose duty it is or shall be to receive, count, certify, register, report, or give effect to the vote of such citizen, upon the presentation by him of his affidavit, stating such offer and the time and place thereof, and the name of the officer or person whose duty it was to act thereon, and that he was wrongfully prevented by such person or officer from performing such act, shall for every such offence forfeit and pay the sum of $500 dollars to the person aggrieved, and also be guilty of a misdemeanor.

Payment of the capitation-tax on or before the 15th of January preceding the day of the election is beyond all doubt one of the prerequisite acts, if not the only one, referred to in that part of the section; and it is equally clear that the introductory clause of the section is wholly inapplicable to a case where the citizen, claiming the right to vote at such an election, has actually paid the capitation-tax as required by the election law of the State.   Voters who have seasonably paid the tax are in no need of any opportunity to perform such a prerequisite to qualify them to vote; but the third section of the act was passed to provide for a class of citizens who had not paid the tax, and who had offered to pay it, and the offer had failed to be carried into execution by reason of the wrongful act or omission of the person or officer charged with the duty of receiving or permitting the performance of such prerequisite.

Qualified voters by the law of the State are male citizens over twenty-one years of age, who have been residents of the city at least six months, and of the ward in which they reside at least sixty days, immediately prior to the day of the election; and who have paid the capitation-tax assessed by the city on or before the fifteenth day of January preceding the day of the election.   Obviously, the payment of the capitation-tax on or before the time mentioned is a prerequisite to qualify the citizen to vote; and the purpose of the second section is to secure to the citizen an opportunity to perform that prerequisite, and to punish the persons and officers charged with the duty of

furnishing the citizen with such an opportunity to perform such prerequisite, in case such person or officer refuses or knowingly omits to do his duty in that regard.    Grant that, still it is clear that the punishment of the offender would not retroact and give effect to the right of the citizen to vote, nor secure to the public the right to have his vote received, counted, registered, reported, and made effectual at that election.

3. Injustice of the kind, it was foreseen, might be done; and, to remedy that difficulty, the third section was passed, the purpose of which is to provide that the offer of any such citizen to perform such prerequisite, if the offer fails to be carried into execution by reason of the wrongful act or omission of the person or officer charged with the duty of receiving or permitting such performance, shall be deemed and held as a perform-ance in law of such act and prerequisite; and the person so offering to perform such prerequisite, and so failing by reason of the wrongful act or omission of the person or officer charged with such duty, if *otherwise* qualified, shall be entitled to vote in the same manner and to the same extent as if he had, in fact, performed such prerequisite act.    Nothing short of the performance of the prerequisite act will entitle any citizen to vote at any such election in that State, if the opportunity to perform the prerequisite is furnished as required by the act of Congress; but if those whose duty it is to furnish the opportunity to perform the act refuse or omit so to do, then the offer to perform such prerequisite act, if the offer fails to be carried into execution by the wrongful act or omission of those whose duty it is to receive and permit the performance of the prerequisite act, shall have the same effect in law as the actual performance.

Such an offer to perform can have the same effect in law as actual performance *only* in case where it fails to be carried into execution by reason of the wrongful act or omission of the person or officer charged with the duty of receiving or permitting such performance; from which it follows that the offer must be made in such terms, and under such circumstances, that, if it should be received and carried into execution, it would constitute a legal and complete performance of the prerequisite act.    What the law of the State requires in that regard is, that

the citizen offering to vote at such an election should have paid
the capitation-tax assessed by the city, which in this case was one
dollar and fifty cents, on or before the 15th of January preceding
the day of election.   Unless the offer is made in such terms and
under such circumstances, that, if it is accepted and carried into
execution, it would constitute a legal and complete performance
of the prerequisite act, the person or officer who refused or omit-
ted to carry the offer into execution would not incur the penalty
nor be guilty of the offence defined by that section of the act;
for it could not be properly alleged that it failed to be carried
into effect by the wrongful act or omission of the person or
officer charged with the duty of receiving and permitting such
performance.

Viewed in the light of these suggestions, it must be that the
offer contemplated by the third section of the act is an offer
made in such terms, and under such circumstances, that, if it be
accepted and carried into execution by the person or officer to
whom it is made, it will constitute a complete performance of
the prerequisite, and·show that the party making the offer, if
*otherwise* qualified, is entitled to vote at the election.

Evidence is entirely wanting to show that the authors of the
Enforcement Act ever intended to abrogate any State election
law, except so far as it denies or abridges the right of the citi-
zen to vote on account of race, color, or previous condition of
servitude.   Every discrimination on that account is forbidden
by the Fifteenth Amendment; and the first section of the act
under consideration provides, as before remarked, that all citi-
zens, *otherwise* qualified to vote, . . . shall be entitled and
allowed to vote, . . . without distinction of race, color, or
previous condition of servitude, any constitution, law, &c., to
the contrary notwithstanding.   State election laws creating
such discriminations are superseded in that regard by the
Fifteenth Amendment; but the Enforcement Act furnishes no
ground to infer that the law-makers intended to annul the State
election laws in any other respect whatever.   Had Congress
intended by the third section of that act to abrogate the elec-
tion law of the State creating the prerequisite in question, it is
quite clear that the second section would have been wholly
unnecessary, as it would be a useless regulation to provide the

means to enable citizens to comply with a prerequisite which is abrogated and treated as null by the succeeding section. Statutes should be interpreted, if practicable, so as to avoid any repugnancy between the different parts of the same, and to give a sensible and intelligent effect to every one of their provisions; nor is it ever to be presumed that any part of a statute is supererogatory or without meaning.    Potter's Dwarris, 145.

Difficulties of the kind are all avoided if it be held that the second section was enacted to afford citizens an opportunity to perform the prerequisite act to qualify themselves to vote, and to punish the person or officer who refuses or knowingly omits to perform his duty in furnishing them with that opportunity, and that the intent and purpose of the third section are to protect such citizens from the consequences of the wrongful refusal or wilful omission of such person or officer to receive and give effect to the actual offer of such citizen to perform such prerequisite, if made in terms, and under such circumstances, that the offer, if accepted and carried into execution, would constitute an actual and complete performance of the act made a prerequisite to the right of voting by the State law.    Apply these suggestions to the fourth count of the indictment, and it is clear that the allegations in that regard are insufficient to describe the offence defined by the third section of the Enforcement Act.

4. Beyond all doubt, the general rule is, that, in an indictment for an offence created by statute, it is sufficient to describe the offence in the words of the statute; and it is safe to admit that that general rule is supported by many decided cases of the highest authority : but it is equally certain that exceptions exist to the rule, which are as well established as the rule itself, most of which result from another rule of criminal pleading, which, in framing indictments founded upon statutes, is paramount to all others, and is one of universal application, — that every ingredient of the offence must be accurately and clearly expressed ; or, in other words, that the indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted.    *United States* v. *Cook*, 17 Wall. 174.

Speaking of that principle, Mr. Bishop says it pervades the

entire system of the adjudged law of criminal procedure, as
appears by all the cases; that, wherever we move in that de-
partment of our jurisprudence, we come in contact with it; and
that we can no more escape from it than from the atmosphere
which surrounds us.   1 Bishop, Cr. Pro., 2d ed., sect. 81;
Archbold's Crim. Plead., 15th ed., 54; 1 Stark Crim. Plead.,
236; 1 Am. Cr. Law, 6th rev. ed., sect. 364; *Steel* v. *Smith*,
1 Barn. & Ald. 99.

Examples of the kind, where it has been held that excep-
tions exist to the rule that it is sufficient in an indictment
founded upon a statute to follow the words of the statute, are
very numerous, and show that many of the exceptions have
become as extensively recognized, and are as firmly settled, as
any rule of pleading in the criminal law.   Moreover, says Mr.
Bishop, there must be such an averment of facts as shows
*prima facie* guilt in the defendant; and if, supposing all the
facts set out to be true, there is, because of the possible non-
existence of some fact not mentioned, room to escape from the
*prima facie* conclusion of guilt, the indictment is insufficient,
which is the exact case before the court.   1 Bishop, Cr. Pro.,
2d ed., sect. 325.

It is plain, says the same learned author, that if, after a full
expression has been given to the statutory terms, any of the
other rules relating to the indictment are left uncomplied with,
the indictment is still insufficient.   To it must be added what
will conform also to the other rules.   Consequently, the general
doctrine, that the indictment is sufficient if it follows the words
of the statute creating and defining the offence, is subject to
exceptions, requiring the allegation to be expanded beyond the
prohibiting terms.   1 id., sect. 623.

In general, says Marshall, C. J., it is sufficient in a libel
(being a libel of information) to charge the offence in the very
words which direct the forfeiture; but the proposition is not,
we think, universally true.   If the words which describe the
subject of the law are general, . . . we think the charge in the
libel ought to conform to the true sense and meaning of those
words as used by the legislature.   *The Mary Ann*, 8 Wheat.
389.

Similar views are expressed by this court in *United States* v.

*Gooding*, 12 Wheat. 474, in which the opinion was given by Mr. Justice Story. Having first stated the general rule, that it is sufficient certainty in an indictment to allege the offence in the very terms of the statute, he proceeds to remark, " We say, in general; for there are doubtless cases where more particularity is required, either *from the obvious intention of the legislature*, or from the application of *known principles of law*. Known principles of law require more particularity in this case, in order that all the ingredients of the offence may be accurately and clearly alleged; and it is equally clear that the intention of the legislature also requires the same thing, as it is obvious that the mere statement of the party that he offered to perform the prerequisite was never intended to be made equivalent to performance, unless such statement was accompanied by an offer to pay the tax, and under circumstances which show that he was ready and able to make the payment. Authorities are not necessary to prove that an indictment upon a statute must state all such facts and circumstances as constitute the statute offence, so as to bring the party indicted precisely within the provisions of the statute defining the offence.

Statutes are often framed, says Colby, to meet the relations of parties to each other, to prevent frauds by the one upon the other; and, in framing such statutes, the language used is often elliptical, leaving some of the circumstances expressive of the relation of the parties to each other to be supplied by intendment or construction. In all such cases, the facts and circumstances constituting such relation must be alleged in the indictment, though not expressed in the words of the statute. 2 Colby, Cr. Law, 114; *People* v. *Wilbur*, 4 Park, Cr. Cas. 21; *Com.* v. *Cook*, 18 B. Monr. 149; *Pearce* v. *The State*, 1 Sneed, 63; *People* v. *Stone*, 9 Wend. 191; *Whiting* v. *The State*, 14 Conn. 487; *Anthony* v. *The State*, 29 Ala. 27; 1 Am. Cr. Law, 6th rev. ed., sect. 364, note *d*, and cases cited.

Like the preceding counts, the preliminary allegations of the fourth count are without objection; and the jury proceed to present that the party offering to vote, having then and there all the qualifications, as to age, citizenship, and residence, required by the State law, did, *on the thirtieth day of January*, 1873, in order that he might become qualified to vote at said election,

offer to the collector at his office in said city to pay any capitation-tax due from him to said city, or any capitation-tax that had been theretofore assessed against him by said city, or which could be assessed against him by said city, or which said city or said collector claimed was due from him to said city; and that the said collector then and there wrongfully refused, on account of his race or color, to give the said party an opportunity to pay said capitation-tax for the preceding year, and then and there wrongfully refused to receive said tax from the said party in order that he might become qualified to vote at said election, the said collector having then and there given to citizens of the white race an opportunity to pay such taxes due from them to said city, in order that they might become qualified for that purpose.

All that is there alleged may be admitted, and yet it may be true that the complaining party never made any offer at the time and place mentioned to pay the capitation-tax of one dollar and fifty cents due to the city at the time and place mentioned, in such terms, and under such circumstances, that if the offer as made had been accepted by the person or officer to whom the offer was made, and that such person or officer had done every thing which it was his duty to do, or every thing which it was in his power to do, to carry it into effect, the offer would have constituted performance of the prerequisite act.

Actual payment of the capitation-tax on or before the 15th of January preceding the day of election is the prerequisite act to be performed to qualify the citizen, without distinction of race, color, or previous condition of servitude, to vote at said election. Such an offer, therefore, in order that it may be deemed and held as a performance in law of such prerequisite, must be an offer to pay the amount of the capitation-tax; and the party making the offer must then and there possess *the ability and means* to pay the amount to the person or officer to whom the offer is made; for, unless payment of the amount of tax is then and there made to the said person or officer, he would not be authorized to discharge the tax, and could not carry the offer into execution without violating his duty to the city.

5. Readiness to pay, therefore, is necessarily implied from

the language of the third section, as it is only in case the offer fails to be carried into execution by reason of the wrongful act or omission of the person or officer charged with the duty of receiving or permitting such performance that the offer can be deemed and held as performance in law of such prerequisite act. Where the party making the offer is not ready to pay the tax to the person or officer to whom the offer is made, and has not then and there the means to make the payment, it cannot be held that the offer fails to be carried into execution by reason of the wrongful act or omission of the person or officer to whom the offer is made, as it would be a perversion of law and good sense to hold that it is the duty of such a person or officer to carry such an offer into execution by discharging the tax without receiving the amount of the tax from the party making the offer of performance.

Giving full effect to the several allegations of the count, nothing approximating to such a requirement is therein alleged, nor can any thing of the kind be implied from the word " offer " as used in any part of the indictment. Performance of that prerequisite, by citizens *otherwise* qualified, entitles all such, without distinction of race, color, or previous condition of servitude, to vote at such an election; and the offer to perform the same, if the offer is made in terms, and under such circumstances, that, if it be accepted and carried into execution, it will constitute performance, will also entitle such citizens to vote in the same manner and to the same extent as if they had performed such prerequisite, provided the offer fails to be carried into execution by reason of the wrongful act or omission of the person or officer charged with the duty of receiving and permitting such performance.

Judges, inspectors, and other officers of elections, must take notice of these provisions, as they constitute the most essential element or ingredient of the offence defined by the third section of the act. Officers of the elections, whether judges or inspectors, are required to carry those regulations into full effect; and the provision is, that any judge, inspector, or other officer of election, whose duty it is or shall be to receive, count, certify, register, report, or give effect to the vote of such citizens, who shall wrongfully refuse or omit to receive, count, cer-

tify, register, or give effect to the vote of any such citizen, upon the presentation by him of his affidavit stating such offer, and the time and place thereof, and the name of the officer or person whose duty it was to act on such offer, and that he, the citizen, was wrongfully prevented by such person or officer from performing such prerequisite act, shall for every such offence forfeit and pay the sum of $500 to the person aggrieved, and also be guilty of a misdemeanor, and be fined and imprisoned as therein provided.

6. Of course, it must be assumed that the terms of the affidavit were exactly the same as those set forth in the third count of the indictment; and, if so, it follows that the word " offer " used in the affidavit must receive the same construction as that already given to the same word in that part of the section which provides that the offer, if it fail to be carried into execution by reason of the wrongful act or omission of the person or officer charged with the duty of receiving or permitting such performance, shall be deemed and held as a performance in law of such prerequisite act.   Decisive confirmation of that view is derived from the fact that the complaining party is only required to state in his affidavit the offer, the time, and the place thereof, the name of the person or officer whose duty it was to act thereon, and that he, the affiant, was wrongfully prevented by such person or officer from performing such prerequisite act.

None will deny, it is presumed, that the word " offer " in the affidavit means the same thing as the word " offer " used in the declaratory part of the same section; and, if so, it must be held that the offer described in the affidavit must have been one made in such terms, and under such circumstances, that, if the offer had been accepted, it might have been carried into execution by the person or officer to whom it was made; or, in other words, it must have been an offer to do whatever it was necessary to do to perform the prerequisite act; and it follows, that if the word " offer," as used in the act of Congress, necessarily includes readiness to pay the tax, it is equally clear that the affidavit should contain the same statement.   Plainly it must be so; for unless the offer has that scope, if it failed to be carried into execution, it could not be held that the failure was ·by

the wrongful act or omission of the person or officer to whom the offer was made. Such a construction must be erroneous; for, if adopted, it would lead to consequences which would shock the public sense, as it would require the collector to discharge the tax without payment, which would be a manifest violation of his duty. Taken in any point of view, it is clear that the third count of the indictment is too vague, uncertain, and indefinite in its allegations to constitute the proper foundation for the conviction and sentence of the defendants. Even suppose that the signification of the word " offer " is sufficiently comprehensive to include readiness to perform, which is explicitly denied, still it is clear that the offer, as pleaded in the fourth count, was not in season to constitute a compliance with the prerequisite qualification, for the reason that the State statute requires that the capitation-tax shall be paid *on or before the fifteenth day of January preceding the day of the election.*

Having come to these conclusions, it is not necessary to examine the fourth section of the Enforcement Act, for the reason that it is obvious, without much examination, that no one of the counts of the indictment is sufficient to warrant the conviction and sentence of the defendants for the offence defined in that section.

MR. JUSTICE HUNT: —

I am compelled to dissent from the judgment of the court in this case.

The defendants were indicted in the Circuit Court of the United States for the District of Kentucky. Upon the trial, the defendants were, by the judgment of the court, discharged from the indictment on account of its alleged insufficiency.

The fourth count of the indictment contains the allegations concerning the election in the city of Lexington; that by the statute of Kentucky, to entitle one to vote at an election in that State, the voter must possess certain qualifications recited, and have paid a capitation-tax assessed by the city of Lexington; that James F. Robinson was the collector of said city, entitled to collect said tax; that Garner, in order that he might be entitled to vote, did offer to said Robinson, at his office, to pay any capitation-tax which had been or could be assessed against

him, or which was claimed against him; that Robinson refused to receive such tax on account of the race and color of Garner; that at the time of the election, having the other necessary qualifications, Garner offered his vote, and at the same time presented an affidavit to the inspector stating his offer aforesaid made to Robinson, with the particulars required by the statute, and the refusal of Robinson to receive the tax; that Farnaugh consented to receive his vote, but the defendants, constituting a majority of the inspectors, wrongfully refused to receive the same, which refusal was on account of the race and color of the said Garner.

This indictment is based upon the act of Congress of May 31, 1870. 16 Stat. 140.

The first four sections of the act are as follows:—

"SECTION 1. That all citizens of the United States, who are or shall be otherwise qualified by law to vote at any election by the people in any state, territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding.

"SECT. 2. That if, by or under the authority of the constitution or laws of any State or the laws of any Territory, any act is or shall be required to be done as a prerequisite or qualification for voting, and, by such constitution or laws, persons or officers are or shall be charged with the performance of duties, in furnishing to citizens an opportunity to perform such prerequisite, or to become qualified to vote, it shall be the duty of every such person and officer to give to all citizens of the United States the same and equal opportunity to perform such prerequisite, and to become qualified to vote, without distinction of race, color, or previous condition of servitude; and, if any such person or officer shall refuse or knowingly omit to give full effect to this section, he shall, for every such offence, forfeit and pay the sum of $500 to the person aggrieved thereby, to be recovered by an action on the case with full costs, and such allowance for counsel-fees as the court shall deem just; and shall also, for every such offence, be deemed guilty of a misdemeanor, and shall, on conviction thereof, be fined not less than five

hundred dollars, or be imprisoned not less than one month and not more than one year, or both, at the discretion of the court.

"SECT. 3. That whenever, by or under the authority of the constitution or laws of any State, or the laws of any Territory, any act is or shall be required to [be] done by any citizen as a prerequisite to qualify or entitle him to vote, the offer of any such citizen to perform the act required to be done as aforesaid shall, if it fail to be carried into execution by reason of the wrongful act or omission aforesaid of the person or officer charged with the duty of receiving or permitting such performance, or offer to perform, or acting thereon, be deemed and held as a performance in law of such act; and the person so offering and failing as aforesaid, and being otherwise qualified, shall be entitled to vote in the same manner and to the same extent as if he had, in fact, performed such act; and any judge, inspector, or other officer of election, whose duty it is or shall be to receive, count, certify, register, report, or give effect to the vote of any such citizen who shall wrongfully refuse or omit to receive, count, certify, register, report, or give effect to the vote of such citizen, upon the presentation by him of his affidavit stating such offer, and the time and place thereof, and the name of the officer or person whose duty it was to act thereon, and that he was wrongfully prevented by such person or officer from performing such act, shall, for every such offence, forfeit and pay the sum of $500 to the person aggrieved thereby, to be recovered by an action on the case, with full costs, and such allowance for counsel-fees as the court shall deem just; and shall also, for every such offence, be guilty of a misdemeanor, and shall, on conviction thereof, be fined not less than $500, or be imprisoned not less than one month and not more than one year, or both, at the discretion of the court.

"SECT. 4. That if any person, by force, bribery, threats, intimidation, or other unlawful means, shall hinder, delay, prevent, or obstruct, or shall combine and confederate with others to hinder, delay, prevent, or obstruct, any citizen from doing any act required to be done to qualify him to vote or from voting at any election as aforesaid, such person shall, for every such offence, forfeit and pay the sum of $500 to the person aggrieved thereby, to be recovered by an action on the case, with full costs and such allowance for counsel-fees as the court shall deem just; and shall also, for every such offence, be deemed guilty of a misdemeanor, and shall, on conviction thereof, be fined not less than $500, or be imprisoned not less than one month and not more than one year, or both, at the discretion of the court."

It is said, in opposition to this indictment and in hostility to the statute under which it is drawn, that while the second section makes it a penal offence for any officer to refuse an opportunity to perform the prerequisite therein referred to on account of the race and color of the party, and therefore an indictment against that officer may be good as in violation of the Fifteenth Amendment, the third section, which relates to the inspectors of elections, omits all reference to race and color, and therefore no indictment can be sustained against those officers. It is said that Congress has no power to punish for violation of the rights of an elector generally, but only where such violation is attributable to race, color, or condition. It is said, also, that the prohibition of an act by Congress in general language is not a prohibition of that act on account of race or color.

Hence it is insisted that both the statute and the indictment are insufficient. This I understand to be the basis of the opinion of the majority of the court.

On this I observe, —

1. That the intention of Congress on this subject is too plain to be discussed. The Fifteenth Amendment had just been adopted, the object of which was to secure to a lately enslaved population protection against violations of their right to vote on account of their color or previous condition. The act is entitled " An Act to enforce the right of citizens of the United States to vote in the several States of the Union, and for other purposes." The first section contains a general announcement that such right is not to be embarrassed by the fact of race, color, or previous condition. The second section requires that equal opportunity shall be given to the races in providing every prerequisite for voting, and that any officer who violates this provision shall be subject to civil damages to the extent of $500, and to fine and imprisonment. To suppose that Congress, in making these provisions, intended to impose no duty upon, and subject to no penalty, the very officers who were to perfect the exercise of the right to vote, — to wit, the inspectors who receive or reject the votes, — would be quite absurd.

2. Garner, a citizen of African descent, had offered to the collector of taxes to pay any capitation-tax existing or claimed

to exist against him as a prerequisite to voting at an election to be held in the city of Lexington on the thirtieth day of January, 1873. The collector illegally refused to allow Garner, on account of his race and color, to make the payment. This brought Garner and his case within the terms of the third section of the statute, that "the person so offering and failing as aforesaid " — that is, who had made the offer which had been illegally rejected on account of his race and color — shall be entitled to vote "as if he had, in fact, performed such act." He then made an affidavit setting forth these facts, stating, with the particularity required in the statute, that he was wrongfully prevented from paying the tax, and presented the same to the inspector, who wrongfully refused to receive the same, and to permit him to vote, on account of his race and color.

A wrongful refusal to receive a vote which was, in fact, incompetent only by reason of the act " aforesaid," — that is, on account of his race and color, — brings the inspector within the statutory provisions respecting race and color. By the words " as aforesaid," the provisions respecting race and color of the first and second sections of the statute are incorporated into and made a part of the third and fourth sections.

To illustrate : Sect. 4 enacts, that if any person by unlawful means shall hinder or prevent any citizen from voting at any election " as aforesaid," he shall be subject to fine and imprisonment. What do the words, " as aforesaid," mean ? They mean, for the causes and pretences or upon the grounds in the first and second sections mentioned ; that is, on account of the race or color of the person so prevented. All those necessary words are by this expression incorporated into the fourth section. The same is true of the words " the wrongful act or omission as aforesaid," and " the person so offering and failing as aforesaid," in the third section.

By this application of the words " as aforesaid," they become pertinent and pointed. Unless so construed, they are wholly and absolutely without meaning. No other meaning can possibly be given to them. " The person (Garner) so offering and failing as aforesaid shall be entitled to vote as if he had performed the act." He failed " as aforesaid " on account of his

race.   The inspectors thereupon " wrongfully refused to receive his vote " because he had not paid his capitation-tax.   His race and color had prevented that payment.   The words " hindered and prevented his voting as aforesaid," in the fourth section, and in the third section the words "wrongfully refuse " and " as aforesaid," sufficiently accomplish this purpose of the statute.   They amount to an enactment that the refusal to receive the vote on account of race or color shall be punished as in the third and fourth sections is declared.

I am the better satisfied with this construction of the statute, when, looking at the Senate debates at the time of its passage, I find, 1st, That attention was called to the point whether this act did make the offence dependent on race, color, or previous condition ; 2d, That it was conceded by those having charge of the bill that its language must embrace that class of cases; 3d, That they were satisfied with the bill as it then stood, and as it now appears in the act we are considering.

The particularity required in an indictment or in the statutory description of offences has at times been extreme, the distinctions almost ridiculous.   I cannot but think that in some cases good sense is sacrificed to technical nicety, and a sound principle carried to an extravagant extent.   The object of an indictment is to apprise the court and the accused of what is charged against him, and the object of a statute is to declare or define the offence intended to be made punishable.   It is laid down, that " when the charge is not the absolute perpetration of an offence, but its primary characteristic lies in the intent, instigation, or motives of the party towards its perpetration, the acts of the accused, important only as developing the *mala mens*, and not constituting of themselves the crime, need not be spread upon the record."   *United States* v. *Almeida*, Whart. Prec. 1061, 1062, note ; 1 Whart. C. L. § 285, note.

In the case before us, the acts constituting the offence are all spread out in the indictment, and the alleged defects are in the facts constituting the *mala mens*.   The refusal to receive an affidavit as evidence that the tax had been paid by Garner, and the rejection of his vote, are the essential acts of the defendants which constitute their guilt.   The rest is matter of motive or instigation only.   As to these, the extreme particularity and

the strict construction expected in indictments, and penal statutes would seem not to be necessary. In *Sickles* v. *Sharp*, 13 Johns. 49, it is said, " The rule that penal statutes are to be strictly construed admits of some qualification. The plain and manifest intention of the legislature ought to be regarded." In *United States* v. *Hartwell*, 6 Wall. 385, it is said, " The object in construing penal as well as other statutes is to ascertain the legislative intent. The words must not be narrowed to the exclusion of what the legislature intended to embrace, but that intention must be gathered from the words. When the words are general, and embrace various classes of persons, there is no authority in the court to restrict them to one class, when the purpose is alike applicable to all." In *Ogden* v. *Strong*, 2 Paine, C. C. 584, it is said, " Statutes must be so construed as to make all parts harmonize, and give a sensible effect to each. It should not be presumed that the legislature meant that any part of the statute should be without meaning or effect."

In *United States* v. *Morris*, 14 Pet. 474, the statute made it unlawful for a person " voluntarily to serve on a vessel employed and made use of in the transportation of slaves from one foreign country to another." No slaves had been actually received or transported on board the defendant's vessel; but the court held that the words of the statute embraced the case of a vessel sailing with the intent to be so employed. The court say, " A penal statute will not be extended beyond the plain meaning of its words; . . . yet the evident intention of the legislature ought not to be defeated by a forced and overstrict construction."

In the case of *The Donna Mariana*, 1 Dods. 91, the vessel was condemned by Sir William Scott under the English statute condemning vessels in which slaves " shall be exported, transported, carried," &c., although she was on her outward voyage, and had never taken a slave on board. " The result is, that, where the general intent of a statute is to prevent certain acts, the subordinate proceedings necessarily connected with them, and coming within that intent, are embraced in its provisions." Id.

In *Hodgman* v. *People*, 4 Den. 235, 5 id. 116, an act subject-

ing an offender to " the penalties " of a prior act was held to subject him to an indictment, as well as to the pecuniary penalties in the prior statute provided for.    Especially should this liberal rule of construction prevail, where, though in form the statute is penal, it is in fact to protect freedom.

An examination of the surrounding circumstances, a knowledge of the evil intended to be prevented, a clear statement in the statute of the acts prohibited and made punishable, a certain knowledge of the legislative intention, furnish a rule by which the language of the statute before us is to be construed. The motives instigating the acts forbidden, and by which those acts are brought within the jurisdiction of the Federal authority, need not be set forth with the technical minuteness to which reference has been made.    The intent is fully set forth in the second section; and the court below ought to have held, that, by the references in the third and fourth sections to the motives and instigations declared in the second section, they were incorporated into and became a part of the third and fourth sections, and that a sufficient offence against the United States authority was therein stated.

I hold, therefore, that the third and fourth sections of the statute we are considering do provide for the punishment of inspectors of elections who refuse the votes of qualified electors on account of their race or color.    The indictment is sufficient, and the statute sufficiently describes the offence.

The opinion of the majority of the court discusses no subjects except the sufficiency of the indictment and the validity of the act of May 31, 1870.    Holding that there was no valid law upon which the crime charged could be predicated, it became unnecessary that the opinion should discuss other points. If it had been held by the court that the indictment was good, and that the statute created the offence charged, the question would have arisen, whether such statute was constitutional; and it was to this question that much the larger part of the argument of the counsel in the cause was directed.    If the conclusions I have reached are correct, this question directly presents itself; and I trust it is not unbecoming that my views upon the constitutional points thus arising should be set forth.    I have no warrant to say that those views are, or are not, entertained

by any or all of my associates. The opinions and the arguments are those of the writer only.

The question of the constitutionality of the act of May 31, 1870, arises mainly upon the Fifteenth Amendment to the Constitution of the United States. It is as follows:—

" 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

" 2. The Congress shall have power to enforce this article by appropriate legislation."

I observe, in the first place, that the right here protected is in behalf of a particular class of persons; to wit, citizens of the United States. The limitation is to the persons concerned, and not to the class of cases in which the question shall arise. The right of citizens of the United States to vote, and not the right to vote at an election for United States officers, is the subject of the provision. The person protected must be a citizen of the United States; and, whenever a right to vote exists in such person, the case is within the amendment. This is the literal and grammatical construction of the language; and that such was the intention of Congress will appear from many considerations. As originally introduced by Mr. Senator Henderson, it read, " No State shall deny or abridge the right of its citizens to vote and hold office on account of race, color, or previous condition." Globe, 1868–69, pt. i. p. 542, Jan. 23, 1869.

The Judiciary Committee reported back the resolution in this form : " The right of citizens of the United States to vote and hold office shall not be denied or abridged by the United States or any State on account of race, color, or previous condition of servitude. The Congress, by appropriate legislation, may enforce the provisions of this article." Id. Omitting the words " and hold office," this is the form in which it was adopted. The class of persons indicated in the original resolution to be protected were described as citizens of a State; in the resolution when reported by the committee, as citizens of the United States. In neither resolution was there any limitations as to the character of the elections at which the vote was to be given. If there was a right to vote, and the person offer-

ing the vote was a citizen, the clause attached.    It is both illiberal and illogical to say that this protection was intended to be limited to an election for particular officers; to wit, those to take part in the affairs of the Federal government.

Congress was now completing the third of a series of amendments intended to protect the rights of the newly emancipated freedmen of the South.

In the adoption of the Thirteenth Amendment, — that slavery or involuntary servitude should not exist within the United States, or any place subject to their jurisdiction, — it took the first and the great step for the protection and confirmation of the political rights of this class of persons.

In the adoption of the Fourteenth Amendment, — that " all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States in which they reside," and that " no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws," — another strong measure in the same direction was taken.

A higher privilege was yet untouched; a security, vastly greater than any thus far given to the colored race, was not provided for, but, on the contrary, its exclusion was permitted. This was the elective franchise, — the right to vote at the elections of the country, and for the officers by whom the country should be governed.

By the second section of the Fourteenth Amendment, each State had the power to refuse the right of voting at its elections to any class of persons; the only consequence being a reduction of its representation in Congress, in the proportion which such excluded class should bear to the whole number of its male citizens of the age of twenty-one years.    This was understood to mean, and did mean, that if one of the late slaveholding States should desire to exclude all its colored population from the right of voting, at the expense of reducing its representation in Congress, it could do so.

The existence of a large colored population in the Southern

States, lately slaves and necessarily ignorant, was a disturbing element in our affairs. It could not be overlooked. It confronted us always and everywhere. Congress determined to meet the emergency by creating a political equality, by conferring upon the freedmen all the political rights possessed by the white inhabitants of the State. It was believed that the newly enfranchised people could be most effectually secured.in the protection of their rights of life, liberty, and the pursuit of happiness, by giving to them that greatest of rights among freemen, — the ballot. Hence the Fifteenth Amendment was passed by Congress, and adopted by the States. The power of any State to deprive a citizen of the right to vote on account of race, color, or previous condition of servitude, or to impede or to obstruct such right on that account, was expressly negatived. It was declared that this right of the citizen should not be thus denied or abridged.

The persons affected were citizens of the United States; the subject was the right of these persons to vote, not at specified elections or for specified officers, not for Federal officers or for State officers, but the right to vote in its broadest terms.

The citizen of this country, where nearly every thing is submitted to the popular test and where office is eagerly sought, who possesses the right to vote, holds a powerful instrument for his own advantage. The political and personal importance of the large bodies of emigrants among us, who are intrusted at an early period with the right to vote, is well known to every man of observation. Just so far as the ballot to them or to the freedman is abridged, in the same degree is their importance and their security diminished. State rights and municipal rights touch the numerous and the every-day affairs of life: those of the Federal government are less numerous, and, to most men, less important. That Congress, possessing, in making a constitutional amendment, unlimited power in what it should propose, intended to confine this great guaranty to a single class of elections, — to wit, elections for United States officers, — is scarcely. to be credited.

I hold, therefore, that the Fifteenth Amendment embraces the case of elections held for state or municipal as well as for federal officers; and that the first section of the act of May

31, 1870, wherein the right to vote is freed from all restriction by reason of race, color, or condition, at all elections by the people, — state, county, town, municipal, or of other subdivision, — is justified by the Constitution.

It is contended, also, that, in the case before us, there has been no denial or abridgment by the State of Kentucky of the right of Garner to vote at the election in question. The State, it is said, by its statute authorized him to vote; and, if he has been illegally prevented from voting, it was by an unauthorized and illegal act of the inspectors.

The word " State " " describes sometimes a people or community of individuals united more or less closely in political relations, inhabiting temporarily or permanently the same country; often it denotes only the country or territorial region inhabited by such a community; not unfrequently it is applied to the government under which the people live; at other times it represents the combined idea of people, territory, and government. It is not difficult to see, that, in all these senses, the primary conception is that of a people or community. The people, in whatever territory dwelling, either temporarily or permanently, and whether organized under a regular government or united by looser and less definite relations, constitute the State. . . . In the Constitution, the term ' State ' most frequently expresses the combined idea just noticed, of people, territory, and government. A State, in the ordinary sense of the Constitution, is a political community of free citizens, occupying a territory of defined boundaries, organized under a government sanctioned and limited by a written constitution, and established by the consent of the governed. It is the union of such States under a common constitution which forms the distinct and greater political unit which that constitution designates as the United States, and makes of the people and States which compose it one people and one country." *Texas* v. *White*, 7 Wall. 720, 721.

That the word " State " is not confined in its meaning to the legislative power of a community is evident, not only from the authority just cited, but from a reference to the various places in which it is used in the Constitution of the United States. A few only of these will be referred to.

The power of Congress to " regulate commerce among the

several States " (sect. 8, subd. 3) refers to the commerce between the inhabitants of the different States, and not to transactions between the political organizations called "States." The people of a State are here intended by the word " State." The numerous cases in which this provision has been considered by this court were cases where the questions arose upon individual transactions between citizens of different States, or as to rights in, upon, or through the territory of different States.

" Vessels bound to or from one State shall not be obliged to enter, clear, or pay duties, in another." Sect. 9, subd. 5. This refers to region or locality only.

So " the electors (of President and Vice-President) shall meet in their respective States, and vote," &c. Art. 2, sect. 1, subd. 3.

Again: when it is ordained that the judicial power of the United States shall extend " to controversies between two or more States, between a State and the citizens of another State, between citizens of different States, between citizens of the same State claiming lands under grants of different States, and between a State or the citizens thereof and foreign States, citizens, or subjects " (art. 3, sect. 2, subd. 1), we find different meaning attached to the same word in different parts of the same sentence. The controversy " between two or more States " spoken of refers to the political organizations known as States; the controversy " between a State and the citizens of another State " refers to the political organization of the first-named party, and again to the persons living within the locality where the citizens composing the second party may reside; the controversy " between citizens of different States, between citizens of the same State claiming lands under grants of different States," refers to the local region or territory described in the first branch of the sentence, and to the political organization as to the grantor under the second branch.

" Full faith and credit shall be given in each State to the public acts, records, and judicial proceedings, of every other State." Art. 4, sect. 1. Full faith shall be given in or throughout the territory of each State. By whom? By the sovereign State, by its agencies and authorities. To what is

faith and credit to be given? To the acts of the political organization known as the State. Not only this, but to all its agencies, to the acts of its executive, to the acts of its courts of record. The expression " State," in this connection, refers to and includes all these agencies; and it is to these agencies that the legislation of Congress under this authority has been directed, and it is to the question arising upon the agencies of the courts that the questions have been judicially presented. *Hampton* v. *McConnell*, 3 Wheat. 234; *Green* v. *Sacramento*, 3 W. C. C. 17; *Bank of Alabama* v. *Dalton*, 9 How. 528. The judicial proceedings of a State mean the proceedings of the courts of the State. It has never been doubted, that, under the constitutional authority to provide that credit should be given to the records of a " State," it was lawful to provide that credit should be given to the records of the courts of a State. For this purpose, the court is the State.

The provision, that " the United States shall guarantee to every State a republican form of government," is a guaranty to the people of the State, and may be exercised in their favor against the political power called the " State."

It seems plain that when the Constitution speaks of a State, and prescribes what it may do or what it may not do, it includes, in some cases, the agencies and instrumentalities by which the State acts. When it is intended that the prohibition shall be upon legislative action only, it is so expressed. Thus, in art. 1, sect. 10, subd. 1, it is provided that " no State shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts." The provision is, not that no State shall impair the obligation of contracts, but that no State shall pass a law impairing the obligation of contracts.

The word " State" in the Fifteenth Amendment is to be construed as in the paragraph heretofore quoted respecting commerce among the States, and in that which declares that acts of a State shall receive full faith and credit in every other State; that is, to include the acts of all those who proceed under the authority of the State. The political organization called the " State " can act only through its agents. It may act through a convention, through its legislature, its governor, or its magistrates and officers of lower degree. Whoever is authorized to

wield the power of the State is the State, and this whether he acts within his powers or exceeds them. If a convention of the State of Kentucky should ordain or its legislature enact that no person of African descent, or who had formerly been a slave, should be entitled to vote at its elections, such ordinance or law would be void. It would be in excess of the power of the body enacting it. It would possess no validity whatever. It cannot be doubted, however, that it would afford ground for the jurisdiction of the courts under the Fifteenth Amendment. It is the State that speaks and acts through its agents; although such agents exercise powers they do not possess, or that the State does not possess, and although their action is illegal. Inspectors of elections represent the State. They exercise the whole power of the State in creating its actual government by the reception of votes and the declaration of the results of the votes. If they wilfully and corruptly receive illegal votes, reject legal votes, make false certificates by which a usurper obtains an office, the act is in each case the act of the State, and the result must be abided by until corrected by the action of the courts. No matter how erroneous, how illegal or corrupt, may be their action, if it is upon the subject which they are appointed to manage, it binds all parties, as the action of the State, until legal measures are taken to annul it. They are authorized by the State to act in the premises; and, if their act is contrary to their instructions or their duty, they are nevertheless officers of the State, acting upon a subject committed to them by the State, and their acts are those of the State. The legislature speaks; its officers act. The voice and the act are equally those of the State.

I am of the opinion, therefore, that the refusal of the defendants, inspectors of elections, to receive the vote of Garner, was a refusal by the State of Kentucky, and was a denial by that State, within the meaning of the Fifteenth Amendment, of the right to vote.

It is contended, further, that Congress has no power to enforce the provisions of this amendment by the enactment of penal laws; that the power of enforcement provided for is limited to correcting erroneous decisions of the State court, when presented to the Federal courts by appeal or writ of error. "For

example (it is said), when it is declared that no State shall deprive any person of life, liberty, or property, without due process of law, this declaration is not intended as a guaranty against the commission of murder, false imprisonment, robbery, or other crimes committed by individual malefactors, so as to give Congress power to pass laws for the punishment of such crimes in the several States generally."

So far as the act of May, 1870, shall be held to include cases not dependent upon race, color, or previous condition, and so far as the power to impose pains and penalties for those offences may arise, I am not here called upon to discuss the subject.

So far as this argument is applied to legislation for offences committed on account of race or color, I hold it to be entirely unsound. If sound, it brings to an impotent conclusion the vigorous amendments on the subject of slavery. If there be no protection to the ignorant freedman against hostile legislation and personal prejudice other than a tedious, expensive, and uncertain course of litigation through State courts, thence by appeal or writ of error to the Federal courts, he has practically no remedy. It were as well that the amendments had not been passed. Of rights infringed, not one in a thousand could be remedied or protected by this process.

In adopting the Fifteenth Amendment, it was ordained as the second section thereof, " The Congress shall have power to enforce this article by appropriate legislation." This was done to remove doubts, if any existed, as to the former power; to add, at least, the weight of repetition to an existing power.

It was held in the *United States Bank Cases* and in the *Legal-Tender Cases* (*McCullough* v. *Maryland*, 4 Wheat. 316; *Gibbons* v. *Ogden*, 7 id. 204; *New York* v. *Miln*, 11 Pet. 102; *Knox* v. *Lee*, 12 Wall. 457; *Dooley* v. *Smith*, 13 id. 604) that it was for Congress to determine whether the necessity had arisen which called for its action. If Congress adjudges that the necessities of the country require the establishment of a bank, or the issue of legal-tender notes, that judgment is conclusive upon the court. It is not within their power to review it.

If Congress, being authorized to do so, desires to protect the freedman in his rights as a citizen and a voter, and as against

those who may be prejudiced and unscrupulous in their hostility to him and to his newly conferred rights, its manifest course would be to enact that they should possess that right; to provide facilities for its exercise by appointing proper superintendents and special officers to examine alleged abuses, giving jurisdiction to the Federal courts, and providing for the punishment of those who interfere with the right. The statute-books of all countries abound with laws for the punishment of those who violate the rights of others, either as to property or person, and this not so much that the trespassers may be punished as that the peaceable citizen may be protected. Punishment is the means; protection is the end. The arrest, conviction, and sentence to imprisonment, of one inspector, who refused the vote of a person of African descent on account of his race, would more effectually secure the right of the voter than would any number of civil suits in the State courts, prosecuted by timid, ignorant, and penniless parties against those possessing the wealth, the influence, and the sentiment of the community. It is certain that in fact the legislation taken by Congress, which we are considering, was not only the appropriate, but the most effectual, means of enforcing the amendment.

That the legislation in this respect is constitutional is also proved by the previous action of Congress and of this court.

Art. 4, sect. 5, subd. 3, of the Constitution provides as follows: "No person held to service or labor in one State, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due."

At the time of the adoption of the Constitution containing this provision, slavery was recognized as legal in many States. The rights of the slaveholder in his slave were intended to be protected by this clause. To enforce this protection, Congress, from time to time, passed laws providing not only the means of restoring the escaped slave to his master, but inflicting punishment upon those who violated that master's rights. Thus, as early as 1793, Congress enacted not only that the master or his agent might seize and arrest such fugitive slave, and, upon obtaining a certificate from a judge or magistrate, carry him back

to the State from whence he escaped, and return him into slavery, but that every person who hindered or obstructed such master or agent, or who harbored or concealed such fugitive, after notice that he was such, should be subject to damages not only, but to a penalty of $500, to be recovered for the benefit of the claimant in any court proper to try the same.     1 Stat. 302. By the act of 1850 (9 Stat. 462), the circuit courts were ordered to enlarge the number of commissioners, "with a view to afford reasonable facilities to reclaim fugitives from labor."

The ninth section of the act provided that any person who should wilfully obstruct or hinder the removal of such fugitive, either with or without process, or should rescue or aid or abet an attempt to escape, or should harbor or conceal the fugitive, having notice, should for either of said offences be subject to a fine not exceeding $1,000, and imprisonment not exceeding six months, by indictment and conviction in the United States Court, "and shall pay and forfeit, by way of civil damages to the party injured by such illegal conduct, the sum of $1,000 for each fugitive so lost as aforesaid, to be recovered by action of debt," &c.

In *Prigg* v. *Pennsylvania,* 16 Pet. 539, the legislation of 1793 was held to be valid.

It was held in *Sims's Case,* 7 Cush. 285, that the act of 1850 was constitutional, and that the State tribunals cannot by writ of *habeas corpus* interfere with the Federal authorities when acting upon cases arising under that act.

In *Ableman* v. *Booth,* 21 How. 506, it was held by this court that the Fugitive-slave Act of 1850 was constitutional in all its provisions, and that a *habeas corpus* under the State laws must not be obeyed, but the authority of the United States must be executed.

The case of Prigg, decided under the act of 1793, and that of Booth, under the act of 1850, are pertinent to the present question.

In the former case, it was held that the act of 1793, so far as it authorized the owner to seize and recapture his slave in any State of the Union, was self-executing, requiring no aid from legislation, either State or National. The clause relating to fugitive slaves, it is there said, is found in the National and not

in the State Constitution. It was said to be a necessary conclusion, in the absence of all positive provision to the contrary, that the national government is bound through its own departments, legislative, judicial, or executive, to carry into effect all the rights and duties imposed upon it by the Constitution. This doctrine is useful at the present time, and is pertinent to the point we are considering. The clause protecting the freedmen, like that sustaining the rights of slaveholders, is found in the Federal Constitution only. Like the former, it provides the means of enforcing its authority, through fines and imprisonments, in the Federal courts ; and here, as there, the national government is bound, through its own departments, to carry into effect all the rights and duties imposed upon it by the Constitution. In connection with the clause of the Constitution just quoted, there was not found, as here, an express authority in Congress to enforce it by appropriate legislation; and yet the court decide not only that Congress had power to enforce its provisions by fine and imprisonment, but that the right to legislate on the subject belongs to Congress exclusively. Courts should be ready, now and here, to apply these sound and just principles of the Constitution.

This provision of the Constitution and these decisions seem to furnish the rule of deciding the constitutionality of the law in question, rather than that which provides that life, liberty, or property, shall not be interfered with except by due process of law. It is not necessary to consider how far Congress may legislate upon individual crimes under that provision. If I am right in this view, the legislation we are considering — to wit, the enforcement of the Fifteenth Amendment by the means of penalties and indictments — is legal.

It is a well-settled principle, that, if an indictment contain both good counts and bad counts, a judgment of guilty upon the whole indictment will be sustained.

The record shows that the court below considered each and every count of the indictment as insufficient, and that judgment was entered discharging the defendants without day ; *i.e.*, from the whole indictment. Upon the view I have taken of the validity of the fourth count, this judgment was erroneous. It should be reversed, and a trial ordered upon the indictment.