## Case No. 11,720.

### Ex parte REYNOLDS et al.

[3 Hughes, 559.] [1]

Circuit Court, W. D. Virginia. Nov., 1878.

REMOVAL OF CAUSES — NEGROES—DENIAL OF JUSTICE—WHITE JURY — HABEAS CORPUS.

A writ of habeas corpus granted by a circuit court of the United States commanding the sheriff of a county to bring the bodies of two colored persons before the said court with a statement of the cause of their detention, the court proceeding on the allegation of the petition of the prisoners, that, being colored persons, they had been tried capitally before a state court by a jury exclusively white, in contravention of section 641 of the Revised Statutes of the United States.

At the April term of the circuit court of Patrick county, Virginia, Burwell Reynolds and Lee Reynolds, under the age of 21, were arraigned and led to the bar for trial under an indictment charging them with the murder of one Aaron C. Shelton. Thereupon they, by counsel, in the language of the record, moved the court that the venire in this cause, composed entirely of the white race, be so modified as to allow one-third of the venire to be composed of their race, they being colored, which motion was overruled upon the ground that the court had no authority to change the venire, it appearing that the said venire had been regularly drawn from the jury box according to law. The accused, by counsel, then appealed to the attorney for the commonwealth and the counsel assisting in the prosecution, that as the ballots in the jury box were entirely of the white race, they, the attorney for the commonwealth and feed counsel for the prosecution, allow the motion, the accused waiving all objections to the illegality of so constituting the jury, which the attorney for the commonwealth and the feed prosecutors refused. Thereupon the accused, by counsel, filed their petition, verified by their affidavit, praying that this prosecution may be removed to the next circuit court for the United States for the Western district of Virginia, in the town of Danville; which prayer was denied by the court.

Thereupon the following petition was presented to the judge of the circuit court of Patrick county: "Your petitioners, Lee Reynolds and Burwell Reynolds, represent that there is now pending against them a criminal prosecution in the circuit court of Patrick, in which they are charged with the murder of one Aaron C. Shelton. Your petitioners are negroes, aged, respectively, seventeen and

nineteen; that the man whom they are charged with having murdered was a white man. Your petitioners allege that the right secured to them by the law providing for the equal rights of citizens of the United States is denied to them in the judicial tribunal of the county of Patrick, of which county they are natives and citizens. They allege that by the laws of Virginia all male citizens, twenty-one years of age, and not over sixty, who are entitled to vote and hold office under the constitution and laws of this state, shall be liable to serve as jurors. This law allows the right as well as requires the duty of the race to which they belong to serve as jurors. Yet the grand jury who made the indictment against them, as well as the venire summoned to try them, are exclusively composed of the white race. They have applied through their counsel to your honor, the judge of the said court, and also to the prosecuting attorney of said county, as well as to the feed counsel employed to assist in the prosecution, that a portion of the venire by which they are to be tried in the said circuit court of Patrick, should be at least in part composed of competent jurors of their own race and color. This right has been refused them. They allege that a strong prejudice exists in the community of said county against them, independent of the merits of the case, and based solely upon the fact that your petitioners, the accused, are negroes, and the man whom they are charged with having murdered was a white man. From this fact alone they are satisfied that they cannot obtain an impartial trial before a jury composed exclusively of the white race. They further allege that their race have never been allowed the right to serve as jurors, either in civil or criminal cases in the county of Patrick in any case, civil or criminal, in which their race have ever been in any way interested up to the present time. Your petitioners, therefore, pray that the said prosecution may be removed to the next circuit court to be held for the United States for the Western district of Virginia in the town of Danville."

This petition was sworn to according to law. The petition was denied. The accused then of course went to trial before a jury composed of white jurors, they having elected to be tried separately. Burwell R., the younger boy, was convicted of murder in the first degree. Upon a motion for a new trial, the verdict was promptly set aside without argument. Lee Reynolds was then put upon trial, which resulted in a verdict of murder in the second degree, and sentenced to the state penitentiary for fifteen years. A motion was also made in this case for a new trial as contrary to law and evidence, which was overruled. His counsel asked and obtained a certificate of the facts from his honor, the judge. They were obtained in order to take the case of Lee by writ of error to the court of appeals of Virginia. The facts, however, were the same in both cases.

---

1 [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

The facts certified are as follows: That Aaron C. Shelton had become provoked, some time preceding the homicide, because a younger brother of his had been ducked by the children of a negro school, for hallooing "school-butter," of which school Lee Reynolds was a member. His brother, Burwell Reynolds, who was jointly indicted with him, took an active part in the ducking. This occurred about two weeks before the homicide. On Tuesday morning preceding the homicide, Aaron C. Shelton passed the house in which the school was then in session, and hallooed "school-butter," and passed on to his work undisturbed, about four hundred yards, to where he was to load his wagon with saw-logs, in which business he was at that time engaged. At recess of the school on the same day—the teacher having left the school in charge of one of the grown and advanced scholars—another brother of Aaron C. Shelton, probably thirteen years of age, approached the schoolhouse at the distance of one hundred and fifty steps and hallooed "school-butter." The school children then pursued him until they arrived at where Aaron C. Shelton was standing in the road, with a stick in his hand; his uncle, Asa Tuggle, being present. Some altercation took place between Aaron C. Shelton and the school children, they retreating and he pursuing with a rock and stick, stating that his brother had been ducked a short time before, and that he might pass there when he damn pleased and halloo "school-butter," and if he was ducked again he would shoot their heartstrings out, and if necessary, would follow them into the schoolhouse to do so, and if the teacher interfered he would shoot him. Neither Burwell nor Lee Reynolds was present on this occasion, being engaged at that time at work on their father's farm. Shelton, however, approached a sister of Burwell and Lee Reynolds, shook a stick over her head, and asked who it was that called him a rogue? She said, "Nobody," and asked him what all this meant? He replied, one of your brothers ducked one of my little brothers some time ago. She said her brother did not duck his brother, but only patted a little water on his head. Shelton then said he would pat for him. Shelton then used abusive language to her, which the witness declined to repeat in court. Mary Burwell, one of the witnesses for the defence, informed Burwell and Lee Reynolds that evening of the manner in which Aaron C. Shelton had abused their sister. Late in the evening of the same day, Aaron C. Shelton, returning home from work, found Burwell and Lee Reynolds trying to roll one of the saw-logs cut by his uncle, which he was going to carry to the sawmill, out of the road. A road had been cut by the uncle of Aaron C. Shelton by which any one could pass around the logs. Shelton asked Burwell and Lee Reynolds what they were doing? They said they were going to roll the logs out of the

road. He cursed them, and told them if they did he would thrash them. Burwell and Lee Reynolds passed on around the logs after the threat, to the negro schoolhouse before mentioned, which was on their way home, and then stopped. When Aaron C. Shelton arrived at that place, which was also on his way home, he found them standing on the roadside with a stick and axe. They addressed Shelton, and Lee Reynolds. told him they were going back to the log at which he had just found them, the next morning, and were going to roll it out of the road, and if he, Shelton, interfered, they would shoot him, and if he ran, they would make their dogs catch him. This threat was denied by Burwell Reynolds, who was introduced as a witness. Green Shelton, the brother of Aaron C. Shelton, was the witness to this threat. Aaron C. Shelton passed the schoolhouse Wednesday and Thursday for the purpose of hauling the saw-logs which had been cut, without any further interference with the school. On Thursday, about 3 o'clock, he went to load a log on his wagon, which was lying in the road about a quarter of a mile from the log Burwell and Lee were trying to roll out of the road. When he got in sight of the log he intended loading, he saw Burwell and Lee Reynolds standing within fifteen steps of the log. They had been hauling corn from their father's farm, and were returning home by the usual road, and had driven their slide, to which was attached a horse and an ox, outside of the road. As they came up to this point they found a log lying across the road; they passed around this log through a space made by Shelton in removing one of the saw-logs below the road, and stopped. When they were first seen by Shelton they could have seen Shelton at a distance of eighty yards in the road before he reached them, and could have heard him coming about two hundred yards. He came in a fast walk. The track was a single track, with a fence on one side, woods on the other, and two such vehicles could not pass each other without one giving the road. Burwell Reynolds, who was driving the slide, with a little loading on it, left the main track, and drew his slide out of the road down below, and with the head of the ox and horse turned in a direction nearly diagonally with the road. The wagon was found in the road exactly opposite the rear of the slide. Between the wagon and slide, directly between the fore and hind wheels of the wagon, Lee Reynolds was found standing with a gun and stick. Shelton stopped his wagon about fourteen paces from the log which he intended loading. Shelton had hauled a log the day before and stopped his wagon at a position further from the log than he did this day. There was a log across the road when Shelton hauled the first log. He could have stopped at that point and loaded, or could have gone further and turned around and then loaded. When Shelton

stopped his wagon he asked Lee what he was doing with that stick. There was a conflict of testimony as to whether he said he had a right to carry his stick, or whether he said, "If you will get down, God damn you, I will show you." Shelton ordered him to drop the stick, and got out of his wagon. The testimony conflicts as to whether he dropped the stick, or whether Aaron C. Shelton took it from him. Shelton pursued him; and there was a conflict of testimony as to whether he attempted to draw the gun on Shelton or not, while he (Lee) was retreating and Shelton pursuing him. Shelton pursued him twelve or fifteen paces and struck him, knocking him over the log; and at that time Burwell Reynolds ran up and stabbed Shelton in the back with a large butcher-knife, which had been used for a tobacco-knife. It was further proven that Lee Reynolds was found immediately afterwards about fifty yards from the place of the homicide in the woods with his gun cocked. Burwell fled the country; Lee did not. It was further proven that Aaron C. Shelton was a young man twenty-two years of age, of extraordinary physical development, weighing one hundred and sixty pounds. Lee and Burwell, colored boys, respectively eighteen and nineteen years of age. It was further proven that Burwell and Lee were in the habit of carrying the gun, but not the stick and knife; and that Burwell left his place of business to see what he could pick up, and got the knife off the tier in the barn, the barn being two hundred yards from his residence. Such were the facts as certified by the judge at the April term, 1878.

At the trial, at the special term, 28th of October, 1878, the same testimony substantially as above stated, was adduced. The only variance was in substance this: That on Wednesday, Aaron C. Shelton received a message purporting to come from Lee Reynolds, saying that he intended to move that log, and that he had his gun with him, and if he (Shelton) interfered with him he would shoot him. On Wednesday morning, the day after the difficulty at the schoolhouse, the prisoners went back to their farm; and on their way they were informed by Asa Tuggle, the uncle of the deceased, that Aaron C. Shelton told him (Tuggle) to tell them that if he, Shelton, caught them on that road, he would beat them. They received the same warning from the same source on Thursday morning. They went on to their farm along the said road, finished their work, and about 3 o'clock p. m. were returning on the same road, Burwell driving the slide with some little loading on it; Lee was walking in front with a gun and stick in his hand. They came to a tree across the road, which had been cut by the said Asa Tuggle, after they (the prisoners) had gone down in the morning to their farm; it was cut in two saw-logs; the second cut had been hauled away; there was one across the road. The prisoners moved the log out of the road to pass with their slide. While in the act of moving the log, Asa Tuggle, who cut the log across the road, and was engaged for that purpose by the deceased, said: "Now, boys, you have moved that log, and you must take the result." Burwell drove on up the road, which was a single track, about fifteen paces, turned short around the tree into the bushes out of the road. The deceased drove his wagon up opposite the rear of the slide in the only track a wagon could have passed, and stopped at least five or ten paces before it was necessary to have stopped in order to load his log, but had stopped further from the log on the day before, and the slide could have passed out behind the wagon after it stopped. There was a conflict of testimony at this point as to how the difficulty occurred. Whether Lee Reynolds drew the stick upon the deceased, or whether the deceased ordered him to drop it, but that the deceased did get the stick into his possession, and that Lee Reynolds backed and the deceased followed him in a scuffle over the gun for fifteen paces, until the prisoner got to the log. Then Shelton struck him with the stick and knocked him over the log. At this moment Burwell Reynolds, who was with the slide, came up from the rear and stabbed Shelton in the back with a large tobacco-knife. It was proven that it was eighty yards from the slide to where Shelton was first seen with his wagon by the prisoner, and that the slide could have passed the wagon at another and better place in that distance. The case was taken to the court of appeals upon these facts. There was no hesitation in granting Lee Reynolds a new trial. I am certain that Attorney General Field approved of the decision of that court. At the November term, 1878, both cases came up again for trial. Before the trial of either of the prisoners the following order was entered upon their motion:

Commonwealth v. Lee and Burwell Reynolds: Indictment for Murder. The prisoners, Lee and Burwell Reynolds, before the impanelling of the jury for their trial at this term, charged with the murder of Aaron C. Shelton, moved the court to remove said prosecution to the next term of the United States circuit court to be held in Danville, Virginia, upon the ground set forth in their petition, filed and presented at the April term, 1878, of this court, which motion was again overruled and the prayer of the petitioners refused. They were again tried before exclusively white juries, having elected to be tried separately. There was a "hung jury" in the case of Burwell Reynolds, eleven for murder in the first degree, one dissenting. In the case of Lee Reynolds, a verdict for murder in the second degree and sentence to confinement in the state prison for eighteen years instead of fifteen, as on first trial. A motion was made for a new trial in this case and overruled. The facts proven were certified, but with no very material difference

from those in the first case. The facts are incorporated in the statement given above. The cases ended here in the state courts, except the sentence of the court, directing the sheriff to take Lee Reynolds to the state prison, to be there confined for the term of eighteen years. An application was then made in the ordinary form to Judge Rives, district judge of the Western district of Virginia, by petition, for a writ of habeas corpus, and the same was obtained and heard at Danville, at the November term, 1878, and the prisoners, by his writ, taken from the jail of Patrick county by the United States marshal, by him to be held in custody to be tried in the United States circuit court for the offence with which they stood charged in the state court, but to be tried by a mixed venire of both white and black.

The following is the opinion delivered by the judge on the questions of law raised by the petition for the writ:

RIVES, District Judge. I am aware that this application presents questions of novelty, gravity, and delicacy. The law on which it is founded is not familiar to the bar generally, and far less so to the public at large. Hence any action under it is liable to be misunderstood and misrepresented; and thus to give rise to undue excitement, disquiet, and popular disturbance. This particular enactment has not been authoritatively construed; though some light is thrown upon it by decisions of the supreme court upon kindred parts of the same general legislation for the enforcement of civil rights under the late amendments of the constitution. Anything like a conflict of jurisdiction between the state and federal courts ought to be avoided whenever it is possible; and it is to be presumed that each respective set of tribunals will be animated by an equal and common desire to obviate all such interference. Both judicatories are alike subjected by article 6 of the constitution of the United States to that constitution and the laws of congress made in pursuance thereof, and it is expressly added that "the judges in every state shall be bound thereby, anything in the constitution or laws of the state to the contrary notwithstanding." Even where unavoidable, such conflict is apt to disturb the harmony and interrupt the peaceful action of the two governments; to shock the just sensibility and excite unduly the apprehensions of the public. In the consideration, therefore, of this case, I felt I would best consult my own peace and the popular repose if I could find the means thereby of reconciling my duty with a denial of this petition. But, of course, paramount to such considerations was my wish and determination alike to execute the laws of congress in behalf even of the humblest, so as to insure the equal protection of all citizens as guaranteed by the 14th amendment of the constitution. It is not necessary to state such facts of this application as are necessary to the presentation and clear understanding of the question I am to decide. The immediate and last petition here is for a habeas corpus; upon examining the record upon which it is predicated, it will be seen that the parties presented their petitions to the state court before a trial of their cases for the removal of them to this court. Before doing so, however, their counsel asked of the state judge to so reconstruct the jury as to place some of their race and color, qualified according to the laws of the state, upon the venire, on the ground that they could not expect an impartial trial by a jury wholly alien to them in race and color. They were denied this right, and in consequence thereof, and upon the allegation of this denial of the equal protection of the laws, they then submitted to the state court their petition for removal, and now, on the first day of this term, filed the same in this court, asking the cause to be docketed here.

Taking the whole case together, I regard it as a petition for removal which necessarily leads to the remedy by habeas corpus, which they invoked by the more recent petition submitted to me in vacation, the hearing of which I adjourned to this term. After trial and sentence of one of the petitioners, on the mere statement thereof, it would seem the period had passed for removal. In the case of The Justices v. Murry, 9 Wall. [76 U. S.] 274, it was properly held that the fifth section of the act of congress of March 3, 1863 [12 Stat. 756], allowing a removal by writ of error and other process to the circuit court within six months after rendition of judgment, was unconstitutional because contrary to the seventh amendment of the constitution of the United States, declaring that no fact tried by a jury shall be otherwise re-examined in any court of the United States than according to the rules of the common law. This decision was rendered in December, 1869. The act passed April 9, 1866 [14 Stat. 27], entitled "An act to protect all persons in the United States in their civil rights, and furnish the means of their protection," provided for removals of causes to federal courts in compliance with this act thus subsequently pronounced unconstitutional in this particular. Hence, as the law now stands, the petition must be filed in the state court before the trial or final hearing. This was done in this case, but the court overruled the petition and proceeded to the trial, notwithstanding the explicit declaration in section 641, that "upon the filing of such petition all further proceedings in the state courts shall cease and shall not be resumed except as hereinafter provided." What effect if any shall be given to a trial thus had may be best determined by the language and reason of the law. I therefore quote the two sections, 641, 642, omitting therefrom only the terms embracing the case of officers, civil or military, or other persons, for any arrest or imprisonment or other trespasses or wrongs made or committed by virtue of and under color of authority de-

rived from any law providing for equal rights as aforesaid. By this omission the application of the law to the case at bar will be more clearly and compactly seen. For future comments it is proper to give the two sections, with this disembarrassment of other matter, at length and verbatim.

Section 641, Rev. St. U. S. (Ed. 1878) p. 115: "When any civil or criminal prosecution is commenced in any state court for any cause whatever, against any person, who is denied or cannot enforce in the judicial tribunals of the state, or in the part of the state where such suit is prosecuted, any right secured to him by any law providing for the equal rights of all citizens or of all persons within the jurisdiction of the United States; * * * such suit or prosecution may, upon the petition of such defendant, filed in the said state court at any time before the trial or final hearing of said cause, stating the facts and verified by affidavit, be removed for trial into the next circuit court to be held in the district where it is pending. Upon the filing of said petition, all further proceedings in the state courts shall cease, and shall not be resumed except as hereafter provided. But all bail and other security given in such suit or prosecution shall continue in like force and effect as if the same had proceeded to final judgment and execution in the state court. It shall be the duty of the clerk of the state court to furnish such defendant petitioning for a removal copies of said process against him, and of all pleadings, depositions, testimony and other proceedings in the case. If such copies are filed by said petitioner in the circuit court on the first day of its session the cause shall proceed therein in the same manner as if it had been brought there by original process, and if the said clerk refuses or neglects to furnish such copies, the petitioner may thereupon docket the same in the circuit court, and the said court shall then have jurisdiction therein, and may upon proof of such refusal or neglect of said clerk, and upon reasonable notice to the plaintiff, require the plaintiff to file a declaration, petition, or complaint in the cause, and in case of his default may order a nonsuit and dismiss the case at the cost of the plaintiff, and such dismissal shall be a bar to any further suit touching the matter in controversy. But if without such refusal or neglect of said clerk to furnish such copies, and proof thereof, the petitioner for removal fails to file copies in the circuit court, as herein provided, a certificate under the seal of the circuit court, stating such failure, shall be given, and upon the production thereof in said state court the cause shall proceed therein as if no petition for a removal had been filed."

Section 642, p. 116: "When all the acts necessary for the removal of any suit or prosecution as provided in the preceding section have been performed, and the defendant petitioning for such removal is in actual custody on process issued by said state court, it shall be the duty of the clerk of said circuit court to issue a writ of habeas corpus cum causa, and of the marshal by virtue of such writ to take the body of the defendant in his custody, to be dealt with in said circuit court according to law, and the orders of said court, or in vacation, of any judge thereof; and the marshal shall file with or deliver to the clerk of said state court a duplicate copy of said writ."

The only warrant for these enactments is to be found, if at all, in article 14 of the late amendments to the constitution. If they do not come within the designation by section 5 of this article of "legislation appropriate to the enforcement of the provisions of this article," then they are reprobated as void under the decisions of the supreme court in the cases of U. S. v. Reese, 92 U. S. 214, and U. S. v. Cruikshank, Id. 542. Let us, therefore, explore the language and scope of the first section of this article. It is as follows: "Any persons, born or naturalized within the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make and enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law."

It is conceded that this inhibition applies exclusively to the state. But that term presents a complex idea. A state is a sort of trinity; it exists, acts, and speaks in three capacities: legislative, executive, and judicial. What is forbidden to it in one capacity is forbidden to it in each and all. It may not infringe this article by legislation, but it may equally do so by its courts or its executive authorities. Hence, it seems to me, it is in strict pursuance of this article to base the intervention of the federal courts on the inability to enforce in the judicial tribunals of the state or in some part thereof the equal civil rights secured by this article. The mischief is the same whether the deprivation proceeds from the law, the courts, or the executive. It is equally attributable to the state. The laws of the state may be all conformable to the requirements of this article, but its infraction may rest with the courts or executive authorities of the counties. The amendment, to be potential and attain its end, should be enforced, as these enactments purport, by providing a remedy for the dereliction, in whatever quarter it may appear. Hence, to find a casus for the application of this law of federal intervention under the theory of this article, we are not restricted to the action of the legislature alone; it clearly contemplates the failure of executive or judicial remedies for the enforcement of these equal civil rights. But it is objected that this article is silent as to

the right or mode of trial of colored persons accused of state offences. A constitutional provision is necessarily general and never descends to detail. It merely ordains equality of rights and protection to all. In the time of slavery, these persons were not entitled to trial by jury; they were tried by a court of five justices. Will it be pretended that that mode of trial could now be reconciled to this amendment because silent on this point? It is sufficient to answer that it guarantees to them the equal protection of the laws, which obviously includes the same mode of trial and the same measure of punishment. In the same mere technical spirit it is said there is nothing in this article giving colored persons, or indicating for their trial, mixed juries. But inasmuch as a major proposition in logic includes the minor premise, this equal protection can only be had in criminal trials through juries composed of the same persons, and constituted in the same mode as well for negroes as for whites. If a mixed jury is allowable by the state law in all cases, for a stronger reason is it right and permissible for a trial of a negro. In the latter case a white panel cannot be imputed to chance; it must be taken as the result of design in derogation of his right to a fair jury for his trial. The state law is not in fault here. Under it all voters are competent jurors, the selection devolving on the county judge; so that no discrimination is made by it on account of color or race. I have endeavored to follow as closely as practicable this state law in the selection of my juries at this bar. What would be thought or said of me if I, against remonstrance, impanelled negroes exclusively to try white men for offences; and yet the same anomaly and injustice exists in trying negroes by juries of white men alone. The state law, as well as this amendment, guarantees to this lately enfranchised class the same sort of juries for their trial as should reasonably follow from the deliberate omission in the law of any discrimination on account of color or race. The demand, therefore, to reconstruct the venire under the direction of the presiding judge, so as to allow some representation of the prisoner's race upon it was, as it seems to me, in conformity with the law of the state, and a just concession to the spirit of this amendment. I see nothing in the state law to forbid it. On the contrary, ample discretion to that end is reposed with the judge by Code Va. c. 158, p. 1062, §§ 16, 17. The question recurs: Was not its denial under the circumstances a denial to the prisoner of the equal protection of the laws? It is greatly to be deplored that no uniform practice obtains in this regard throughout the commonwealth though the law is the same everywhere. I am informed that the judge of this county invariably gives the accused, when colored, the benefit of a mixed jury; and that it is believed that no harm has ever resulted from it, or any

failure of punitive justice. The same, I am told, is the practice in other counties of the commonwealth; and, I trust, one of the effects of the agitation of this question will be to extend it. If this should become general or be required by law, all pretence for federal interference would be removed; and the law and practice would conform in leading to the just enforcement of equal civil rights to all colors and races. If negroes were to be tried by former slaveholders, once allied to them by interest, affection, and sympathy, the danger might not be great; but if these people are to depend for their lives, liberty, and property on the white men who never knew or felt these ties, I regret to say they are without the guarantees enjoyed by others from the jury trial secured by article 6 of the amendments to the constitution.

From this comparison of the law of congress with this amendment, I am constrained to conclude that the former strictly pursues the latter, is in conformity thereto, and therefore constitutional. Had I come to a different conclusion I should have felt bound to disregard these enactments. True, I should have felt all the delicacy becoming an inferior judge in pronouncing a law of congress unconstitutional; but I should not have shrunk from the responsibility of doing so if, on mature reflection, I should have come to that conclusion. It is a well-settled doctrine, even in courts of the last resort, that a law is not to be lightly pronounced unconstitutional; and never in a case of doubt. The reasonable presumption is in favor of its constitutionality. But it is because I believe the constitution and the law both require it of me, I grant the relief sought of me; surely not under the ridiculous idea that I have any jurisdiction over state crimes or any authority to prosecute them; but merely to secure for the petitioners here the equal protection of the laws of the state as guaranteed by the fourteenth amendment and the law in pursuance thereof. No one can be more sensible than I am of the anomaly of trying these cases at my bar; I have nothing to say of the wisdom, the expediency, or fitness of this legislation; the least I can say is that it gives an anomalous jurisdiction to this court, not easily understood or reconcilable with past practices, but it is sufficient for me to be convinced that I am thus directed by congress in legislation, which they have deemed appropriate to the enforcement of this fundamental part of its reconstruction policy. Nor do I see how any mind conceding the constitutionality of these enactments can arrive at any other conclusion than the absolute right of the parties under the terms of the law to this relief. It ought to be observed that the trial had in one of these cases was in plain defiance of the law which directed all further proceedings to cease on the filing of the petition. That trial must, therefore, go for nothing in this case if I am to be gov-

erned by the plain terms of these enactments. The law left nothing to the discretion of the state judge, save the implied discretion to deny the petition; but such denial was to avail nothing; the case was thereby arrested, and the question remitted to this court at its first session thereafter. I presume as the county of Patrick is annexed by the ruling of this court to the court held at this place, this term may well be regarded as the first after the filing of these petitions. This is the next circuit court in the terms of the law held for this part of the district where parties reside, and whence witnesses are to be summoned.

I have treated this exclusively as a question of removal, and not as application for a habeas corpus, as I have already premised. I take no note of the allegation of petitioners that they believe and declare they cannot get a fair trial in the state court; that is alien to the merits of their application, and has no rightful place here. Their relief and the removal they seek can alone be predicated of some obstruction to their impartial trial arising out of the action of the court, and the selection of a jury with reference, whether designed or not, to color and race. In case of federal officers, indicted in the state courts for state offences, I have under this law exercised the same jurisdiction without objection from any quarter.

If there shall be found on inquiry a want of uniformity, or even semblance of injustice in the practice of the judges or courts in the particular I have named, it is fair to presume it will be rectified in time to avoid this unseemly collision and anomalous interference with the trial of state offences. If there be anything unfair and repulsive to the instincts of justice, and in conflict with all our notions of jury trial in trying negroes exclusively by white men, wholly alien to them in interest and feeling, it admits of speedy redress by the state. I can conceive of no stronger motive on the grounds of humanity and practical statesmanship than that which now exists with the state, who enjoys the fruits of her restoration to the Union by virtue of her formal ratification of this amendment, to observe on her part in all the departments of her service, scrupulously, both in spirit and in deed, its requirements, and to guard and protect beyond all unfriendly cavil the civil rights of this humble class of its useful laborers. We must feel that when the state does its full duty under this amendment there can no longer be a possibility of the interference which offends her dignity and arouses her indignation. Her own independent sense of justice will have righted the wrong, and all this conflict will cease for the future. But without resting on such speculations, but expressing them with entire deference to my state and its courts, I am constrained by my interpretation of the law and constitution to enter the following order:

At the circuit court for the Western district of Virginia, held at Danville, on the 13th day of November, 1878, Burwell and Lee Reynolds, by their counsel, submitted to the court a petition by them presented to the judge of the circuit court for the county of Patrick for the removal of the prosecutions against them into this court, which petition is a part of the record which said petitioners have procured of the clerk of said circuit court of Patrick, and now offer to file in' this court, praying that said prosecutions may be here docketed, and proceeded with here. The court being of opinion that said petitioners have been denied such a trial as is secured to them by the laws of this state by competent jurors, without distinction of race or color, doth direct said causes, upon the petition aforesaid, to be docketed in this court for trial; and the clerk is hereby authorized to issue forthwith a writ of habeas corpus cum causa to the marshal of this district to take the bodies of said defendants into his custody, to be dealt with according to law and the order of this court; and that the clerk of this court in the vacation thereof direct to the said marshal a writ of venire facias for twenty-five jurors, qualified as such by the laws of this state, without the distinction of race or color, to attend on the first day of next term for the trial of said cases at the bar of this court.

NOTE. By order of the general assembly of Virginia, the attorney general of the state, James G. Field, filed a petition in the supreme court of the United States, praying for a writ of mandamus upon Judge Rives, directing him to remand these two prisoners to the sheriff of Patrick. [The writ was awarded. 100 U. S. 313.]